[835 NE2d 1180, 802 NYS2d 72]

JOSEPH DALTON et al., Appellants-Respondents, v GEORGE PATAKI, as Governor of the State of New York, et al., Respondents-Appellants, et al., Respondents. (Action No. 1.)

MRS. LEE KARR, Appellant-Respondent, v GEORGE PATAKI, as Governor of the State of New York, et al., Respondents-Appellants, et al., Respondents. (Action No. 2.)

Argued March 21, 2005; decided May 3, 2005

244

## POINTS OF COUNSEL

*O'Connell and Aronowitz,* Albany (*Cornelius D. Murray* and *James A. Shannon* of counsel), for appellants-respondents in the first above-entitled action. I. Part B of chapter 383 of the Laws of 2001, empowering the Governor to enter into compacts with Indian tribes authorizing them to operate commercialized gambling casinos, violates article I, § 9 of the New York State Constitution. (*Matter of King v Cuomo,* 81 NY2d 247; *Settle v Van Evrea,* 49 NY 280; *People v Rathbone,* 145 NY 434; *Anderson v Regan,* 53 NY2d 356; *Santa Clara Pueblo v Martinez,* 436 US 49; *Cherokee Nation v Georgia,* 5 Pet [30 US] 1; *Worcester v Georgia,* 6 Pet [31 US] 515; *United States v Cook,* 922 F2d 1026, *cert denied sub nom. Tarbell v United States,* 500 US 941; *Catskill Dev., L.L.C. v Park Place Entertainment Corp.,* 217 F Supp 2d 423; *Blue Cross & Blue Shield of Cent. N.Y. v McCall,*

89 NY2d 160.) II. Part D of chapter 383 of the Laws of 2001, authorizing New York State's participation in a multistate lottery, violates article I, § 9 of the New York State Constitution. (*Ramesar v State of New York,* 224 AD2d 757, 88 NY2d 811; *Molina v Games Mgt. Servs.,* 58 NY2d 523; *United States v Grezo,* 566 F2d 854; *Hess v Port Auth. Trans-Hudson Corp.,* 513 US 30; *John Grace & Co. v State Univ. Constr. Fund,* 44 NY2d 84; *Collins v Manhattan & Bronx Surface Tr. Operating Auth.,* 62 NY2d 361; *Braun v State of New York,* 203 Misc 563.) III. Parts B, C and D of chapter 383 of the Laws of 2001 were adopted in violation of article III, § 14 of the New York State Constitution. (*People ex rel. Hatch v Reardon,* 184 NY 431, 204 US 152; *Franklin Natl. Bank of Long Is. v Clark,* 26 Misc 2d 724; *Winner v Cuomo,* 176 AD2d 60; *Silver v Pataki,* 96 NY2d 532; *Matter of Schneider v Rockefeller,* 31 NY2d 420; *Rathbone v Wirth,* 150 NY 459; *Newell v People,* 7 NY 9; *Matter of Smith v Board of Supervisors of St. Lawrence County,* 148 NY 187; *Finger Lakes Racing Assn. v New York State Off-Track Pari-Mutuel Betting Commn.,* 30 NY2d 207; *Flushing Natl. Bank v Municipal Assistance Corp. for City of N.Y.,* 40 NY2d 731.)

*Eliot Spitzer, Attorney General,* Albany (*Caitlin J. Halligan, Daniel Smirlock, Gregory Silbert* and *Marcus J. Mastracco* of counsel), for State respondents-appellants in the first above-entitled action. I. The court below correctly dismissed plaintiffs' challenges to the provision of part B of chapter 383 of the Laws of 2001 authorizing Indian gaming. (*New Mexico v Mescalero Apache Tribe,* 462 US 324; *California v Cabazon Band of Mission Indians,* 480 US 202; *Washington v Confederated Tribes of Colville Indian Reservation,* 447 US 134; *Matter of Orens v Novello,* 99 NY2d 180; *Griffin v Oceanic Contrs., Inc.,* 458 US 564; *Consumer Prod. Safety Commn. v GTE Sylvania, Inc.,* 447 US 102; *Mashantucket Pequot Tribe v State of Conn.,* 913 F2d 1024; *Coeur d'Alene Tribe v State,* 842 F Supp 1268; *United States v Gabriel,* 125 F3d 89; *Saratoga County Chamber of Commerce v Pataki,* 100 NY2d 801.) II. The video lottery terminal lottery authorized by part C of chapter 383 of the Laws of 2001 is a constitutionally valid lottery. (*Matter of Big Apple Food Vendors' Assn. v Street Vendor Review Panel,* 90 NY2d 402; *Whitman v American Trucking Assns., Inc.,* 531 US 457; *LaValle v Hayden,* 98 NY2d 155; *Harris v Economic Opportunity Commn. of Nassau County,* 171 AD2d 223; *Solon v Meurer,* 141 Misc 2d 993; *People v Hines,* 284 NY 93; *Hull v Ruggles,* 56 NY 424; *Trump v Perlee,* 228 AD2d 367; *People v Kim,* 154 Misc 2d 346.) III. The requirement that racetracks reinvest a portion of their vendor

fee in track purses and breeding funds is constitutional. (*Matter of Boerner,* 58 Misc 2d 144; *Matter of von Seidletz,* 6 Misc 2d 583; *Saratoga Harness Racing Assn. v Agriculture & N.Y. State Horse Breeding Dev. Fund,* 22 NY2d 119; *Local Govt. Assistance Corp. v Sales Tax Asset Receivable Corp.,* 2 NY3d 524; *Matter of Moran Towing Corp. v Urbach,* 99 NY2d 443; *Cohen v State of New York,* 94 NY2d 1; *United States v Salerno,* 481 US 739; *Finger Lakes Racing Assn. v New York State Off-Track Pari-Mutuel Betting Commn.,* 30 NY2d 207, 409 US 1031; *People ex rel. Alpha Portland Cement Co. v Knapp,* 230 NY 48; *Matter of Westinghouse Elec. Corp. v Tully,* 63 NY2d 191.) IV. The multi-state lottery authorized by part D of chapter 383 of the Laws of 2001 is constitutional because the State of New York operates the lottery within its borders and all net proceeds are used in aid of education in New York. (*Hess v Port Auth. Trans-Hudson Corp.,* 513 US 30; *John Grace & Co. v State Univ. Constr. Fund,* 44 NY2d 84; *Collins v Manhattan & Bronx Surface Tr. Operating Auth.,* 62 NY2d 361; *Braun v State of New York,* 203 Misc 563.) V. Chapter 383 of the Laws of 2001 was enacted in compliance with article III, § 14 of the New York State Constitution. (*Finger Lakes Racing Assn. v New York State Off-Track Pari-Mutuel Betting Commn.,* 30 NY2d 207, 409 US 1031; *Matter of Schulz v Silver,* 212 AD2d 293, 86 NY2d 835, 87 NY2d 916; *Norwick v Rockefeller,* 70 Misc 2d 923, 40 AD2d 956, 33 NY2d 537; *Matter of King v Cuomo,* 81 NY2d 247; *Settle v Van Evrea,* 49 NY 280; *Matter of Schneider v Rockefeller,* 31 NY2d 420; *Matter of Joslin v Regan,* 63 AD2d 466, 48 NY2d 746; *Matter of Campaign for Fiscal Equity v Marino,* 87 NY2d 235.)

*Bleakley Platt & Schmidt, LLP,* White Plains (*Frederick J. Martin, Robert D. Meade* and *Susan E. Galvão* of counsel), for Yonkers Racing Corporation, respondent-appellant in the first above-entitled action. I. Video lottery gaming, as envisioned by part C of chapter 383 of the Laws of 2001, constitutes a valid lottery under the unambiguous language of article I, § 9 of the New York State Constitution. II. Video lottery is a constitutional lottery under the unambiguous provisions of article I, § 9 of the New York State Constitution. (*People ex rel. Henderson v Board of Supervisors of County of Westchester,* 147 NY 1; *People ex rel. Carter v Rice,* 135 NY 473; *Matter of Sherrill v O'Brien,* 188 NY 185; *Matter of Burns,* 155 NY 23; *Association for Protection of Adirondacks v MacDonald,* 253 NY 234; *Matter of King v Cuomo,* 81 NY2d 247; *People v Carroll,* 3 NY2d 686; *Pink v Alden,* 260 App Div 564, 285 NY 800; *Matter of Van Berkel v Power,* 16 NY2d 37.) III. The Karr brief fails to establish that the video

lottery terminal legislation is not a lottery or is unconstitutional. (*People v Schuler,* 93 Misc 2d 684; *Finger Lakes Racing Assn. v New York State Off-Track Pari-Mutuel Betting Commn.,* 30 NY2d 207, 946.) IV. The Appellate Division, Third Department improperly crossed the line fixed by the constitutional separation of powers to legislate. V. The court below erred in refusing to sever and uphold the remainder of the statute. (*Teeval Co. v Stern,* 301 NY 346; *People v Mancuso,* 255 NY 463; *People ex rel. Alpha Portland Cement Co. v Knapp,* 230 NY 48, 256 US 702; *Williams v Standard Oil Co. of La.,* 278 US 235; *Di Paola v Reilly,* 22 AD2d 910; *People ex rel. Stafford v Travis,* 231 NY 339.)

*Jay. Goldberg, P.C.,* New York City (*Jay Goldberg* and *Faith A. Friedman* of counsel), for appellant-respondent in the second above-entitled action. I. The court below erred when it failed to hold that under the New York State Constitution, the Legislature may not authorize the Governor to act for and bind the State of New York to a compact providing for commercialized casino-type class III gaming on tribal lands. (*Artichoke Joe's Cal. Grand Casino v Norton,* 353 F3d 712; *Saratoga Chamber of Commerce v Pataki,* 293 AD2d 20, 100 NY2d 801; *Seminole Tribe of Fla. v Florida,* 517 US 44; *California v Cabazon Band of Mission Indians,* 480 US 202; *Citizen Band Potawatomi Indian Tribe of Okla. v Oklahoma,* 995 F2d 179; *Mashantucket Pequot Tribe v State of Conn.,* 913 F2d 1024, 499 US 975; *Cheyenne Riv. Sioux Tribe v South Dakota,* 3 F3d 273; *Rumsey Indian Rancheria of Wintun Indians v Wilson,* 64 F3d 1250.) II. The court below erred in holding that video lottery terminals themselves constitute a valid lottery within the meaning of article I, § 9 of the New York State Constitution. (*New York Pub. Interest Research Group v Steingut,* 40 NY2d 250; *Trump v Perlee,* 228 AD2d 367; *Harris v Economic Opportunity Commn. of Nassau County,* 171 AD2d 223.) III. The court below erred in holding that New York's participation in the multistate lottery was not in violation of article I, § 9 of the New York State Constitution. IV. The court below erred in holding that the whole of the legislation was enacted in compliance with article III, § 14 of the New York State Constitution.

*Hodgson Russ LLP,* Buffalo (*Kevin M. Kearney* and *Kathleen Sellers* of counsel), for Finger Lakes Racing Association, Inc., respondent-appellant in the first and second above-entitled actions. I. Legislative enactments must be given appropriate deference. (*Pringle v Wolfe,* 88 NY2d 426; *LaValle v Hayden,* 98

NY2d 155; *Cohen v State of New York,* 94 NY2d 1; *Dunlea v Anderson,* 66 NY2d 265; *Matter of Klein [Hartnett],* 78 NY2d 662, 504 US 912; *Hotel Dorset Co. v Trust for Cultural Resources of City of N.Y.,* 46 NY2d 358; *Paterson v University of State of N.Y.,* 14 NY2d 432; *Matter of Wolpoff v Cuomo,* 80 NY2d 70; *Bourquin v Cuomo,* 85 NY2d 781; *Saratoga County Chamber of Commerce v Pataki,* 293 AD2d 20, 100 NY2d 801.) II. Video lottery terminal gaming will be a lottery, and video lottery terminals are not slot machines. (*Matter of American Tel. & Tel. Co. v State Tax Commn.,* 61 NY2d 393; *Matter of Nelson v New York State Civ. Serv. Commn.,* 96 AD2d 132; *Marsh v Brady,* 152 Misc 2d 990; *Trump v Perlee,* 228 AD2d 367; *Saratoga County Chamber of Commerce v Pataki,* 100 NY2d 801; *Chance Mgt., Inc. v South Dakota,* 97 F3d 1107; *Club Assn. of W. Va. v Wise,* 293 F3d 723.) III. Part C of chapter 383 of the Laws of 2001 properly allocates revenues and directs all net proceeds to education. (*Finger Lakes Racing Assn. v New York State Off-Track Pari-Mutuel Betting Commn.,* 30 NY2d 207; *Matter of Hapletah v Assessor of Town of Fallsburg,* 79 NY2d 244; *Matter of Town of New Castle v Kaufmann,* 72 NY2d 684; *Matter of Westinghouse Elec. Corp. v Tully,* 63 NY2d 191; *Matter of Hynes v Tomei,* 92 NY2d 613; *Town of Islip v Caviglia,* 141 AD2d 148, 73 NY2d 544.) IV. The video lottery terminal provisions do not violate equal protection. (*City of New York v State of New York,* 76 NY2d 479; *Matter of Roosevelt Raceway v County of Nassau,* 18 NY2d 30, 385 US 453; *Nordlinger v Hahn,* 505 US 1; *Tilles Inv. Co. v Gulotta,* 288 AD2d 303; *McGowan v Maryland,* 366 US 420; *Von Kerssenbrock-Praschma v Saunders,* 121 F3d 373; *Burdick v Takushi,* 504 US 428; *Matter of Rosenstock v Scaringe,* 40 NY2d 563; *Town of Lockport, N.Y. v Citizens for Community Action at Local Level, Inc.,* 430 US 259; *Affronti v Crosson,* 95 NY2d 713, 534 US 826.)

*Gibson, Dunn & Crutcher LLP,* New York City (*Randy M. Mastro* of counsel), for intervenor-respondent in the second above-entitled action. I. Federal law mandates that New York permit Indian gaming. (*McClanahan v State Tax Commn. of Arizona,* 411 US 164; *Saratoga County Chamber of Commerce v Pataki,* 100 NY2d 801; *Matter of New York Racing Assn. v Hoblock,* 270 AD2d 31; *Ramesar v State of New York,* 224 AD2d 757; *Intercontinental Hotels Corp. [Puerto Rico] v Golden,* 18 AD2d 45, 15 NY2d 9; *Mashantucket Pequot Tribe v State of Conn.,* 913 F2d 1024; *Lac du Flambeau Band of Lake Superior Chippewa Indians v State of Wis.,* 770 F Supp 480; *American Greyhound Racing, Inc. v Hull,* 146 F Supp 2d 1012, 305 F3d

1015; *United States v Sisseton-Wahpeton Sioux Tribe,* 897 F2d 358; *Artichoke Joe's Cal. Grand Casino v Norton,* 353 F3d 712.) II. This legislation constitutes a proper delegation of authority by the New York State Legislature to the Governor. (*Saratoga Chamber of Commerce v Pataki,* 100 NY2d 801; *Matter of Levine v Whalen,* 39 NY2d 510; *Dorst v Pataki,* 90 NY2d 696; *Bourquin v Cuomo,* 85 NY2d 781; *Matter of Citizens for Orderly Energy Policy v Cuomo,* 78 NY2d 398; *Clark v Cuomo,* 66 NY2d 185; *Boreali v Axelrod,* 71 NY2d 1; *Under 21, Catholic Home Bur. for Dependent Children v City of New York,* 65 NY2d 344.) III. This legislation's enactment fully complied with the New York State Constitution's procedural requirements. (*Silver v Pataki,* 96 NY2d 532; *Heimbach v State of New York,* 59 NY2d 891; *Saxton v Carey,* 44 NY2d 545; *People v Ohrenstein,* 153 AD2d 342, 77 NY2d 38; *Matter of Straniere v Silver,* 218 AD2d 80, 89 NY2d 825; *Finger Lakes Racing Assn. v New York State Off-Track Pari-Mutuel Betting Commn.,* 30 NY2d 207; *Norwick v Rockefeller,* 70 Misc 2d 923, 40 AD2d 956, 33 NY2d 537; *Matter of Schneider v Rockefeller,* 31 NY2d 420; *People ex rel. Hatch v Reardon,* 184 NY 431; *Franklin Natl. Bank of Long Is. v Clark,* 26 Misc 2d 724.)

*Daniel T. Warren,* West Seneca, amicus curiae pro se in the first above-entitled action. I. New York is not compelled to allow class III gaming under the Indian Gaming Regulatory Act of 1988. (*Rumsey Indian Rancheria of Wintun Indians v Wilson,* 64 F3d 1250; *In re Indian Gaming Related Cases,* 331 F3d 1094; *Pipefitters Local Union No. 562 v United States,* 407 US 385; *United States v Tynen,* 11 Wall [78 US] 88; *Traynor v Turnage,* 485 US 535; *Morton v Mancari,* 417 US 535; *United States v Sforza,* 326 F3d 107; *People v Kin Kan,* 78 NY2d 54; *Flanagan v Prudential-Bache Sec.,* 67 NY2d 500; *United States v Cook,* 922 F2d 1026, 500 US 941.) II. The Legislature exceeded its authority in enacting Laws of 2001 (ch 383, part B). (*Thatcher v Morris,* 11 NY 437; *Holberg v Westchester Racing Assn.,* 184 Misc 581; *Moskowitz v Cohen,* 158 Misc 489; *Intercontinental Hotels Corp. [Puerto Rico] v Golden,* 18 AD2d 45; *People v World Interactive Gaming Corp.,* 185 Misc 2d 852; *People v Rathbone,* 145 NY 434; *Anderson v Regan,* 53 NY2d 356; *Ball v Allstate Ins. Co.,* 81 NY2d 22; *Debevoise & Plimpton v New York State Dept. of Taxation & Fin.,* 80 NY2d 657; *Settle v Van Evrea,* 49 NY 280.) III. The Third Department erroneously decided this case and its order should be reversed. (*Saratoga County Chamber of Commerce v Pataki,* 100 NY2d 801; *California v Cabazon Band of Mission Indians,* 480 US 202; *Spokane Tribe*

*of Indians v Washington,* 28 F3d 991; *Seminole Tribe of Fla. v Florida,* 517 US 44; *Rhode Island v Narragansett Indian Tribe,* 19 F3d 685, 513 US 919; *Narragansett Indian Tribe v National Indian Gaming Commn.,* 158 F3d 1335; *Intercontinental Hotels Corp. [Puerto Rico] v Golden,* 15 NY2d 9; *Citizen Band Potawatomi Indian Tribe of Okla. v Green,* 995 F2d 179; *American Greyhound Racing, Inc. v Hull,* 146 F Supp 2d 1012; *Rumsey Indian Rancheria of Wintun Indians v Wilson,* 64 F3d 1250.)

*Law Offices of Neal Brickman,* New York City (*Neal Brickman* of counsel), *Mintz & Gold, LLP* (*Vito J. Titone, Jr.* of counsel), and *Meyer, Suozzi, English & Klein, P.C.,* Mineola (*Michael A. Ciaffa* of counsel), for Standardbred Owners Association, Inc. and others, amici curiae in the first and second above-entitled actions. The Appellate Division adopted an erroneously restrictive view of the kind of the "expenses" that may be deducted from video lottery terminal "proceeds" under article I, § 9 of the New York State Constitution. (*Finger Lakes Racing Assn. v New York State Off-Track Pari-Mutuel Betting Commn.,* 30 NY2d 207; *Matter of Boerner,* 58 Misc 2d 144; *Matter of von Seidlitz,* 6 Misc 2d 583; *Saratoga County Chamber of Commerce v Pataki,* 100 NY2d 801; *Saratoga Harness Racing Assn. v Agriculture & N.Y. State Horse Breeding Dev. Fund,* 22 NY2d 119.)

*Featherstonhaugh, Wiley, Clyne & Cordo, LLP,* Albany (*Randall J. Ezick* of counsel), for New York Thoroughbred Horsemen's Association, Inc., amicus curiae in the first and second above-entitled actions. I. The statutory requirement that a percentage of the racetrack vendor fee revenues be allocated to breeding funds and enhanced purses is consistent with other statutory regulation of the racing industry. (*Matter of Boerner,* 58 Misc 2d 144; *Matter of von Seidlitz,* 6 Misc 2d 583; *Finger Lakes Racing Assn. v New York State Off-Track Pari-Mutuel Betting Commn.,* 30 NY2d 207; *Saratoga Harness Racing Assn. v Agriculture & N.Y. State Horse Breeding Dev. Fund,* 22 NY2d 119.) II. Funds allocated for a vendor fee are not part of the net proceeds and there is no constitutional limitation as to how those monies are thereafter allocated by either the vendor or the Legislature. III. The Legislature and the Division of the Lottery have the discretion to establish the vendor fees to operate the lottery system and the record fails to establish an abuse of discretion in setting the video lottery terminal vendor fee.

## OPINION OF THE COURT

CIPARICK, J.

In 2003, we addressed whether the Governor had the author-

ity to enter into compacts with Indian tribes pursuant to the federal Indian Gaming Regulatory Act of 1988 (IGRA) (25 USC §§ 2701-2721; 18 USC §§ 1166-1168) allowing casino gaming on Indian lands within the state (*see Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801 [2003]). We determined that the Governor's actions in unilaterally negotiating and entering into such tribal-state compacts violated separation of powers principles because such actions involved policy decisions within the power of the Legislature. Since the compacts were invalidated on this ground, we did not reach the questions whether casino gaming permitted by such tribal-state compacts violated the commercial gambling prohibitions of article I, § 9 of the New York State Constitution and whether IGRA preempts in this area. Those issues are now squarely presented for our review. Also presented is the constitutional validity of video lottery gaming and New York's participation in the multistate Mega Millions lottery.

Chapter 383 of the Laws of 2001 was introduced in the Senate and the Assembly on the evening of October 24, 2001, and the early morning of October 25, 2001. The 81-page bill contained a wide range of provisions aimed, in part, at countering the anticipated negative economic effects of the terrorist attacks of September 11th and at generating revenue. The Governor submitted a message of necessity, certifying the need for an immediate vote on the bill, which had not been on the legislators' desks in final form for the required three calendar days (*see* NY Const, art III, § 14). The Legislature enacted the bill immediately and the Governor signed it into law shortly thereafter.

The provisions at issue on this appeal are parts B, C and D of chapter 383. Adding a new Executive Law § 12, part B authorized the Governor to enter into "a tribal-state compact with the Seneca Nation of Indians pursuant to the [federal] Indian Gaming Regulatory Act of 1988 . . . consistent with a memorandum of understanding between the [parties]" (L 2001, ch 383, part B, § 2). The memorandum of understanding permitted the parties to negotiate a compact to allow class III gaming in up to three casinos.[1] The compact would be deemed adopted by the Legislature when the Governor certified that the agreement provided for, among other things, reasonable access to the gam-

---

1. Class III gaming is the most heavily regulated type of gaming under IGRA. The federal regulations give examples of class III gaming "including but not limited to . . . [a]ny house banking game" such as baccarat or black-

ing facilities by labor unions, a satisfactory system for civil recovery and adequate liability insurance. Part B also authorized the Governor to enter into tribal-state compacts with unnamed tribes to allow up to three additional class III gaming facilities in Ulster and Sullivan counties. Those compacts would likewise be deemed adopted by the Legislature when the Governor certified they met the requisite labor union, civil recovery and liability insurance requirements.

Part C authorized the use of video lottery terminals (VLTs)—under Tax Law § 1617-a—at several racetracks, including Aqueduct, Monticello, Yonkers, Finger Lakes and Vernon Downs (*see* L 2001, ch 383, part C, § 1). The bill also amended Tax Law § 1612 to include a revenue distribution scheme for the VLT proceeds (*see* L 2001, ch 383, part C, § 2). Between 12% and 25% of the total revenue was designated a vendor's fee. The legislation provided that a portion of the vendor's fee must be reinvested in the racing industry by applying it to enhancing purses and to the appropriate breeding fund. Finally, part D amended Tax Law §§ 1604 and 1617 to authorize the State's participation in a multijurisdictional lottery (*see* L 2001, ch 383, part D, §§ 1, 3).

Plaintiffs are a group of citizen taxpayers, state legislators and not-for-profit organizations "opposed to the spread of gambling." They commenced this action in January 2002. Plaintiffs moved for summary judgment declaring parts B, C and D of chapter 383 unconstitutional. Defendants and intervenor-defendant (Park Place) each cross-moved for summary judgment dismissing the complaint. Supreme Court granted the cross motions, denied plaintiffs' motion for summary judgment and declared the challenged portions of chapter 383 of the Laws of 2001 constitutional.

The Appellate Division modified, in a comprehensive opinion, by reversing the portion of Supreme Court's order that declared part C constitutional, declared part C unconstitutional and, as so modified, affirmed (*see* 11 AD3d 62 [2004]). The Court determined that the Governor's message of necessity was sufficient to meet the requirements of article III, § 14 of the State Constitution. It further found that since the State allows the type of gaming at issue, with certain limitations, the gaming was "properly the subject of a tribal-state compact and part B"

jack, casino games including roulette or keno, slot machines, sports betting and lotteries (*see* 25 CFR 502.4).

was constitutional (11 AD3d at 83). Similarly, the Appellate Division found that part D, authorizing the multistate lottery, was constitutional—finding that the State "retains sufficient supervision over the multistate lottery . . . to satisfy the constitutional requirement that a lottery be 'operated by the state'" (11 AD3d at 105 [citations omitted]). The Court also determined that the net proceeds from the multistate lottery were properly dedicated to education in the state (see 11 AD3d at 106).

As to part C—authorizing the operation of video lottery terminals—the Appellate Division concluded that the VLTs were components of lotteries rather than slot machines and, as such, were constitutionally permitted (see 11 AD3d at 94). However, the Court determined that the portion of the legislation directing that certain percentages of the vendor fees be reinvested for enhancing purses and in an appropriate breeding fund did not meet the constitutional requirement that lottery proceeds be dedicated exclusively to the support of education within the state (see 11 AD3d at 99). The Appellate Division found the revenue distribution defect was not severable because severance would result in "either an inflated vendor fee or no fee at all" (11 AD3d at 102). Thus, the Appellate Division declared part C unconstitutional in full. Plaintiffs now appeal, and defendants cross-appeal, as of right pursuant to CPLR 5601 (b) (1). We modify the Appellate Division and declare that parts B, C and D of chapter 383 of the Laws of 2001 are in all respects constitutional.

## New York State Constitution

While our State Constitution generally prohibits gambling, this broad prohibition is subject to limited exceptions. For example, the Constitution provides that

> "no lottery or the sale of lottery tickets, pool-selling, bookmaking, or any other kind of gambling, except lotteries operated by the state and the sale of lottery tickets in connection therewith as may be authorized and prescribed by the legislature, the net proceeds of which shall be applied exclusively to or in aid or support of education in this state as the legislature may prescribe, and except pari-mutuel betting on horse races as may be prescribed by the legislature and from which the state shall derive a

reasonable revenue for the support of government, shall hereafter be authorized or allowed within this state" (NY Const, art I, § 9 [1]).

The Constitution further allows individual municipalities to authorize, by vote at a general or special election, certain "games of chance"—such as bingo, lotto or other types of games where a winner is determined on the basis of a winning number, color or symbol (see NY Const, art I, § 9 [2]). These types of games are further restricted by the Constitution, which requires that only certain religious, charitable or nonprofit organizations will be authorized to conduct these types of games (see NY Const, art I, § 9 [2] [1]). In addition, only "bona fide" members of the particular organization are permitted to "participate in the management or operation of such game" and are not permitted to receive any remuneration for their participation (see NY Const, art I, § 9 [2] [3]-[4]). Further, the entire net proceeds from these games must be dedicated to the lawful purposes of the organization (see NY Const, art I, § 9 [2] [2]). The Constitution also restricts the prizes that can be awarded—allowing no more than $250 for a single prize and a maximum total of $1,000 for "any series of prizes on one occasion" (NY Const, art I, § 9 [2]).

Plaintiffs argue that because the State Constitution prohibits commercial gambling, subject to specifically stated exceptions, the Legislature may not authorize the Governor to enter into tribal-state compacts, nor may it allow video lottery terminals or permit the State to participate in a multistate lottery.

Legislative enactments are entitled to "a strong presumption of constitutionality" (see Schulz v State of New York, 84 NY2d 231, 241 [1994]). "While the presumption is not irrefutable, parties challenging a duly enacted statute face the initial burden of demonstrating the statute's invalidity 'beyond a reasonable doubt' " (LaValle v Hayden, 98 NY2d 155, 161 [2002], quoting People v Tichenor, 89 NY2d 769, 773 [1997]). With respect to parts C and D of the legislation, plaintiffs have failed to rebut that strong presumption. However, the inquiry is different as to part B, given that the State Constitution expressly prohibits commercial gambling. For part B, we must instead determine whether IGRA preempts this constitutional proscription because the State allows class III gaming for certain charitable and other purposes.

## Background of IGRA

Necessary to our determination is an analysis of the federal Indian Gaming Regulatory Act of 1988 (25 USC §§ 2701-2721; 18 USC §§ 1166-1168). Contrary to plaintiffs' assertion, IGRA has preempted the field in the area of Indian gaming but permits states to negotiate with tribes to regulate gaming. IGRA was enacted, in part, to promote the self-sufficiency and economic development of Indian tribes (*see* 25 USC § 2701 [4]; § 2702 [1]). Congress determined that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity" (25 USC § 2701 [5]).

IGRA separates the types of gaming into three classes—classes I, II and III—each subject to a different degree of regulation. Class I gaming consists of "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations" (25 USC § 2703 [6]; *see also* 25 CFR 502.2). This type of gaming is solely within the jurisdiction of the tribes and is not subject to IGRA (*see* 25 USC § 2710 [a] [1]). Class II gaming includes bingo, lotto and certain types of card games—specifically excluding banking card games such as baccarat (*see* 25 USC § 2703 [7] [A], [B]; 25 CFR 502.3 [a]-[c]). Class II activity is permissible on Indian land,[2] subject to the tribe's jurisdiction, if located in a state that otherwise permits such gaming for any purpose and if the Indian tribe passes a resolution that is approved by the Chair of the National Indian Gaming Commission (*see* 25 USC § 2710 [b] [1]).

Class III gaming includes all remaining types of gaming not within class I or II (*see* 25 USC § 2703 [8]). This type of gaming is the most highly regulated. In addition to the requirements for class II gaming—a Chair-approved tribal ordinance and location in a state that otherwise permits such gaming—the class III gaming must also be conducted according to a valid tribal-state compact (*see* 25 USC § 2710 [d] [1] [C]). A tribe seeking to

---

2. Indian lands are defined as "all lands within the limits of any Indian reservation; and . . . any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power" (25 USC § 2703 [4]).

conduct class III gaming on Indian land must request that the state negotiate with the tribe in an attempt to develop a tribal-state compact to regulate gaming activity (*see* 25 USC § 2710 [d] [3] [A]). "Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact" (25 USC § 2710 [d] [3] [A]). Any such compact is subject to the approval of the Secretary of the Interior (*see* 25 USC § 2710 [d] [3] [B]).

Prior to the enactment of IGRA, the United States Supreme Court addressed the applicability of state law to Indian gaming within the state of California (*see California v Cabazon Band of Mission Indians*, 480 US 202 [1987]). *Cabazon* dealt with a federal statute giving California, along with certain other states, criminal and limited civil jurisdiction over Indian land within the state. California sought to enforce a penal statute prohibiting bingo—unless conducted by certain charitable organizations—against two Indian tribes. The Court observed "that Indian tribes retain 'attributes of sovereignty over both their members and their territory' and that 'tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States' " (*Cabazon*, 480 US at 207 [citations omitted]). However, the Court also noted that, if authorized by Congress, state laws would be applicable to tribal lands.

In determining whether the law at issue could be enforced on Indian land, the Supreme Court recognized a distinction between whether the law was prohibitory or regulatory in nature (*see Cabazon*, 480 US at 209). If the purpose of the law is to prohibit specific conduct, it is considered prohibitory and can be enforced on Indian land. If, on the other hand, the law allows the conduct "subject to regulation," the law is regulatory and not enforceable on Indian land (*see Cabazon*, 480 US at 209). "The shorthand test is whether the conduct at issue violates the State's public policy" (*Cabazon*, 480 US at 209). Because the State allowed "a substantial amount of gambling activity, including bingo," the Court determined that the statute at issue was regulatory rather than prohibitory (*see Cabazon*, 480 US at 211). The Court then went on to decide that California's interest in regulating bingo was insufficient as compared with the significant tribal interests.

Congress enacted IGRA in response to *Cabazon* (*see* S Rep No. 100-446, 100th Cong, 2d Sess, reprinted in 1988 US Code Cong & Admin News, at 3071). The legislative history indicates that Congress intended that "unless a tribe affirmatively elects

to have State laws and State jurisdiction extend to tribal lands, the Congress will not unilaterally impose or allow State jurisdiction on Indian lands for the regulation of Indian gaming activities" (S Rep No. 100-446, 100th Cong, 2d Sess, at 5-6, reprinted in 1988 US Code Cong & Admin News, at 3075). The tribal-state compact was designed as a way to reconcile tribal and state interests concerning class III gaming (see S Rep No. 100-446, 100th Cong, 2d Sess, at 6, reprinted in 1988 US Code Cong & Admin News, at 3076).

Significantly, IGRA was "intended to expressly preempt the field in the governance of gaming activities on Indian lands. Consequently, Federal courts should not balance competing Federal, State, and tribal interests to determine the extent to which various gaming activities are allowed" (S Rep No. 100-446, 100th Cong, 2d Sess, at 6, reprinted in 1988 US Code Cong & Admin News, at 3076). Congress expected that the courts would apply the prohibitory/regulatory distinction when deciding whether gaming was permitted in a state, but in a different way than it was applied in *Cabazon* (see S Rep No. 100-446, 100th Cong, 2d Sess, at 6, reprinted in 1988 US Code Cong & Admin News, at 3076). Specifically, rather than determining the degree to which a state's laws would apply to Indian lands, "the courts will consider the distinction between a State's civil and criminal laws to determine whether a body of law is applicable, as a matter of Federal law, to either allow or prohibit certain activities" (S Rep No. 100-446, 100th Cong, 2d Sess, at 6, reprinted in 1988 US Code Cong & Admin News, at 3076).[3]

Following the enactment of IGRA, the Second Circuit addressed a similar situation to that presented here (see *Mashantucket Pequot Tribe v State of Conn.*, 913 F2d 1024 [2d Cir 1990]). The court determined that since Connecticut allowed certain class III gaming—although it was highly restricted by statute—the State only regulated rather than prohibited this type of gaming (see *Mashantucket*, 913 F2d at 1031-1032; *see*

---

**3.** Although the portion of the legislative history specifically discussing the prohibitory/regulatory distinction was referring to class II gaming, the applicable language in IGRA is virtually identical with respect to both class II and class III gaming (see 25 USC § 2710 [b] [1] [A]; [d] [1] [B] [gaming is located in a state that otherwise "permits such gaming for any purpose by any person, organization or entity"]). There is no persuasive reason to treat the language in these two subsections differently.

*also Northern Arapaho Tribe v Wyoming*, 389 F3d 1308, 1312 [10th Cir 2004]).[4]

## Tribal-State Compacts

█ Plaintiffs assert that although the Constitution allows for certain types of regulated gaming, it still completely prohibits *commercial* gaming. However, IGRA does not allow the state to consider the purpose behind the gaming. The language of the statute is clear that class III gaming will be permitted when "located in a State that permits such gaming for *any* purpose by *any* person, organization, or entity" (25 USC § 2710 [d] [1] [B] [emphasis added]). This language is intentionally broad and includes the limited gaming permitted by the New York State Constitution under the supervision and authority of the New York State Racing and Wagering Board (*see* General Municipal Law art 9-A; 9 NYCRR 5600.1 *et seq.*). Through IGRA, Congress has preempted the states in this area. Since New York allows some forms of class III gaming—for charitable purposes—such gaming may lawfully be conducted on Indian lands provided it is authorized by a tribal ordinance and is carried out pursuant to a tribal-state compact (*see* 25 USC § 2710 [d] [1]).

We likewise reject the argument that IGRA specifically provides that state laws prohibiting gambling will apply on Indian lands. Plaintiffs argue that 18 USC § 1166 allows for the constitutional ban on commercial gambling in article I, § 9 to be applied to Indian lands. That section states that "all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State" (18 USC § 1166 [a]). However, the statute further provides that class III gaming conducted pursuant to an approved tribal-state compact will not be considered "gambling" for purposes of that section (*see* 18 USC § 1166 [c] [2]). Thus, the state constitutional prohibition against commercial gambling does not apply to Indian lands that are in compliance with IGRA and governed by a valid tribal-state compact.

---

4. The *Northern Arapaho* court noted that there is a conflict in the interpretation of IGRA—whether a state must negotiate with tribes concerning all forms of class III gaming when it allows any type of class III gaming, or whether it must only negotiate for the specific games permitted in the state (*see Northern Arapaho*, 389 F3d at 1310-1311). We do not address this issue as the plaintiffs have challenged the authority to enter into tribal-state compacts in general, rather than the authority to negotiate for particular games.

Plaintiffs state that IGRA does not require states to enter into a tribal-state compact with Indian tribes, arguing that, as a matter of state sovereignty, "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program" (*New York v United States*, 505 US 144, 188 [1992]). However, it may be to the state's benefit to do so. Through IGRA the states are granted a certain degree of authority over class III gaming that they otherwise would not have due to the sovereignty of Indian nations (*see Seminole Tribe of Fla. v Florida*, 517 US 44, 58 [1996]; US Const, art I, § 8 [3]). Thus, through the compacting process, IGRA confers a benefit on the state by allowing it to negotiate and to have some input into how class III gaming will be conducted.

However, this authority is limited in that if the state either does not negotiate with a tribe or does not do so in good faith, the tribe may bring suit in Federal District Court (*see* 25 USC § 2710 [d] [7] [B]).[5] If the court determines the state has not negotiated in good faith, the court will order the parties "to conclude such a compact within a 60-day period" (25 USC § 2710 [d] [7] [B] [iii]). If an agreement is not reached within that time, the court will appoint a mediator, who "shall select from the two proposed compacts [from the tribe and the state] the one which best comports with the terms of this Act and any other applicable Federal law and with the findings and order of the court" (25 USC § 2710 [d] [7] [B] [iv]). If the state timely agrees, that compact will become the tribal-state compact (*see*

---

5. The G.B. Smith dissent suggests that the State was not required to negotiate in good faith as the Legislature was without authority to legislate in this area (*see* G.B. Smith dissenting op at 285). The constitutional ban on commercial gambling, according to this dissent, cannot be preempted by federal statute and can only be affected through a constitutional amendment. Certainly, if commercial gambling were to be extended to non-Indian lands, the dissent's proposition would be correct, but here we are dealing with the extension of commercial gambling to Indian lands, or lands held in trust by the United States Department of the Interior, to which Congress has seen fit to extend this benefit. This was done with the express intent of protecting Indian sovereignty. The Supremacy Clause of the United States Constitution specifically states that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the contrary notwithstanding" (US Const art VI [2]). Federal law thus preempts even our constitutional ban. This is particularly true in the context of Indian matters, where a traditional exemption from state law will be "lifted only when Congress has made its intention to do so unmistakably clear" (*Montana v Blackfeet Tribe*, 471 US 759, 765 [1985] [referring to Indian exemption from state taxes]).

25 USC § 2710 [d] [7] [B] [vi]). If the state does not agree (or invokes sovereign immunity under the Eleventh Amendment to the United States Constitution), the Secretary of the Interior and the tribe will decide upon procedures for conducting class III gaming (see 25 USC § 2710 [d] [7] [B] [vii]). Thus, if class III gaming is permitted in the state for any purpose, including a strictly charitable purpose, it will be permitted on Indian land with or without the state's involvement. Given the consequence, obviously state involvement and regulation is to be favored.

In the alternative, plaintiffs argue that even if IGRA requires that class III gaming be permitted on Indian lands, the same result is not required on land that is not Indian land. This argument is directed to the portion of part B that authorizes the Governor to enter into tribal-state compacts allowing up to three casinos in Sullivan and Ulster counties (see L 2001, ch 383, part B, § 2, codified at Executive Law § 12 [b]). With a few exceptions, gaming is generally prohibited on lands acquired by the Secretary of the Interior after the enactment of IGRA and held "in trust for the benefit of an Indian tribe" (25 USC § 2719 [a]). Gaming, however, will be permitted when

> "the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination" (25 USC § 2719 [b] [1] [A]).

Here, plaintiffs urge that both the constitutional provision and New York's public policy against commercial gambling prevent the Governor from agreeing that there would not be a detrimental effect on the communities at issue if casinos were located in those areas. The constitutional provision is relevant to the determination under 25 USC § 2710 (d) (1) (B) only— whether class III gaming is permitted for any purpose and thus whether gaming should be allowed on Indian lands. Section 2719 (b) (1) (A) does not call for the Governor to make a determination as to the legality of gaming. Rather, the determination whether gaming would be detrimental to the surrounding community entails an analysis of the potential negative consequences presented by the presence of the casinos, such as social

or economic consequences. The Constitution plainly does not prevent the Governor from determining that there would be no detrimental effect on a particular community.[6]

Plaintiffs' last argument pertaining to part B is that it was an improper delegation of legislative authority for the Legislature to authorize the Governor to execute tribal-state compacts in Sullivan and Ulster counties (*see* L 2001, ch 383, part B, § 2, codified at Executive Law § 12 [b]). In *Saratoga*, we determined that the Governor did not have the authority to "unilaterally . . . negotiate and execute tribal gaming compacts under IGRA" (100 NY2d at 824). The Court observed that the issues that would be covered by a tribal-state compact involved policy decisions that were within the province of the Legislature (*see Saratoga*, 100 NY2d at 823).

Here, the Legislature authorized the Governor to execute the tribal-state compacts and specified that such agreements would be "deemed ratified by the legislature upon the governor's certification" that the compacts contained certain provisions (L 2001, ch 383, part B, § 2, codified at Executive Law § 12 [b]). For example, the Legislature required that the compacts contain assurances that the tribe would provide access to labor unions, an adequate civil recovery system and sufficient liability insurance (*see* L 2001, ch 383, part B, § 2, codified at Executive Law § 12 [b]). The Legislature has thus made the necessary policy determinations as to what the tribal-state compacts must contain and has authorized the Governor to implement those policy determinations by executing the compacts to their specifications. This is a permissible delegation of authority. That the legislation does not specify the names of the tribes or where the casinos will be located does not change this determination (*see Bourquin v Cuomo*, 85 NY2d 781, 785 [1995] ["there need not

---

**6.** We note that the United States Supreme Court recently addressed whether the Oneida Indian Nation was responsible for property taxes on certain property purchased on land that was once an Oneida reservation (*see City of Sherrill v Oneida Indian Nation of N.Y.*, 544 US 197, —, 125 S Ct 1478, 1482-1483 [2005]). The Court determined that the Oneidas could not "unilaterally reassert sovereign control and remove these parcels from the local tax rolls" and that the Tribe would have to follow the procédure set forth in 25 USC § 465, which "authorizes the Secretary of the Interior to acquire land in trust for Indians and provides that the land 'shall be exempt from State and local taxation' " (*City of Sherrill*, 544 US at —, 125 S Ct at 1493). This holding is consistent with our interpretation of IGRA, allowing the Secretary and the Governor to authorize gaming on lands held in trust by the Secretary after determining such gaming would not be detrimental to the surrounding community (*see* 25 USC § 2719 [b] [1] [A]).

be a specific and detailed legislative expression authorizing a particular executive act as long as 'the basic policy decisions underlying the regulations have been made and articulated by the Legislature' " (citation omitted)]).

## Video Lottery Gaming

Plaintiffs next challenge the constitutionality of part C of chapter 383 of the Laws of 2001. That section authorized "the operation of video lottery gaming at Aqueduct, Monticello, Yonkers, Finger Lakes and Vernon Downs racetracks," and at certain other racetracks that are licensed pursuant to article III of the Racing, Pari-Mutuel Wagering and Breeding Law and located within a county that has approved video lottery gaming (L 2001, ch 383, part C, § 1).

The video lottery is played using video lottery terminals, which are each connected to a central system through the use of "site controllers"—computers that connect several VLTs both to each other and to the central system. In the most common form of video lottery gaming, participants at individual VLTs play against each other by purchasing electronic instant tickets from a finite pool. In order to play, individuals place cash or other currency into the VLT to purchase an electronic instant ticket. The player then determines the "game identifier" and the price of the electronic ticket to be purchased. The VLT receives the next ticket from the site controller and displays the predetermined outcome—win or loss. If the player wins, the VLT will print an "electronically encoded instrument" which can be used to play additional video lottery games or can be redeemed for value.[7]

Plaintiffs argue that because video lottery gaming is played using VLTs, which they contend resemble slot machines, the video lottery is not a lottery at all, but rather state-sponsored slot machine gambling forbidden by the Constitution. But whereas slot machines are not mentioned in the Constitution, lotteries are, and they are expressly permitted when operated by the State. Thus, if the video lottery is a lottery, the statute providing for it is constitutional regardless of whether the

---

7. The only other game offered for video lottery play is electronic keno, which is modeled after the current Lotto and Quick Draw lotteries and involves multiple players selecting a series of numbers, colors or symbols in hopes of matching their selections to those later randomly drawn by the central system.

terminals used to play the lottery also look like, or even meet the Penal Law definition of, slot machines.[8]

Since the Constitution does not define the term "lottery," we must first determine what constitutes a lottery within the meaning of article I, § 9. The Penal Law definition of lottery—consisting of consideration, chance and prize (*see* Penal Law § 225.00 [10]; *People v Hines*, 284 NY 93, 101 [1940], *overruled on other grounds People v Kohut*, 30 NY2d 183, 190-191 [1972]; *Trump v Perlee*, 228 AD2d 367, 368 [1st Dept 1996])—provides little guidance, because, as the Court below recognized, this definition applies equally to all forms of gambling or games of chance. Clearly, the limited constitutional exception for state-run lotteries cannot be read to allow any casino game (such as poker, blackjack or roulette) to constitute a valid lottery if operated by the State. Thus, we agree with the Appellate Division (*see* 11 AD3d at 92) that a constitutional lottery requires something more—specifically, the use of tickets and multiple participation, as opposed to a single player competing against a single machine.

It is clear from the language of the Constitution that an authorized lottery requires the sale of tickets (*see* NY Const, art I, § 9 [1] ["no lottery or the sale of lottery tickets . . . except lotteries operated by the state and the sale of lottery tickets in connection therewith . . . shall hereafter be authorized or allowed within this state"]). The Senate debates concerning the 1966 amendment to article I, § 9—allowing state-run lotteries as an exception to the general prohibition against gambling—reflect the same understanding (*see e.g.* New York State Senate Debate Transcripts, 1965 New York Constitution, June 14, 1965, at 4776, 4778, 4798). In addition, the constitutional history reflects that the Senate considered multiple participation an additional element of the definition of a lottery (*see* New York State Senate Debate Transcripts, 1965 New York Constitution, June 14, 1965, at 4808).

The video lottery authorized by part C is consistent with this definition. As noted above, players tender consideration

---

**8.** Indeed, although plaintiffs contend that VLTs fit within the Penal Law definition of a slot machine, as "a gambling device which, as a result of the insertion of a coin or other object, operates, either completely automatically or with the aid of some physical act by the player, in such manner that, depending upon elements of chance, it may eject something of value" (Penal Law § 225.00 [8]), the definition of "[g]ambling device" specifically excludes lottery tickets and other items used to play a lottery (*see* Penal Law § 225.00 [7]).

(cash or other currency) to purchase electronic tickets and receive a prize in the form of compensation or chances to play additional games. Multiple participation is satisfied in that the VLTs are linked through the site controllers to a central system, and players compete against one another for prizes by purchasing tickets from a finite depleting pool of electronic instant lottery tickets, with a set number of predetermined winners randomly distributed, or by choosing a series of keno numbers, colors or symbols from a finite pool in the hope that they, as opposed to other players, will have matched those colors, numbers or symbols later drawn, thus satisfying the element of chance. It is of no constitutional significance that the tickets are electronic instead of paper. The particular methods of conducting the lottery are subject to change with time. The language of the Constitution is not so rigid as to prevent this type of update and modernization. Thus, we conclude that the video lottery is a valid lottery under article I, § 9 (1), and that, rather than slot machines, VLTs are simply mechanical devices for the implementation of the video lottery (*see e.g.* Tax Law § 1604 [a] [8]).[9]

Plaintiffs also argue that part C violated their rights to equal protection because it allows only certain local legislatures to vote to give prior approval for installation of VLTs. They argue that strict scrutiny should be applied because the issue involves the denial of the right to vote. However, as the Appellate Division noted, "[e]ven in voter classification, a State is not prohibited from recognizing the distinctive interests of the residents of its political subdivisions" (*City of New York v State of New York*, 76 NY2d 479, 486 [1990] [holding that it was reasonable to permit Staten Island residents, but no other New York City residents, to vote on the issue of secession]). Thus, rather than strict scrutiny, we use a rational basis standard of review. When reviewing using a rational basis standard, "a classification must be upheld against an equal protection challenge

**9.** The Attorney General opinions relied on by plaintiffs in support of their argument that the video lottery is not a lottery are inapposite (*see* 1981 Ops Atty Gen 68; 1984 Ops Atty Gen No. 84-F1). The 1981 opinion addressed and found unconstitutional proposed video games, such as computer poker and blackjack, that did not involve multiple participation, electronic tickets, or predetermined identification of winning tickets based on random selection. Rather, those games involved a single player pitting his or her skill against a machine. The 1984 opinion involved a proposal by the Division of the Lottery to permit betting on the outcome of professional sports events, which involves an element of skill in picking the winning team or predicting the outcome of the game.

if there is any *reasonably conceivable* state of facts that could provide a rational basis for the classification . . . [I]ndeed, a court may even *hypothesize* the motivations of the State Legislature to discern any conceivable legitimate objective promoted by the provision under attack" *(Port Jefferson Health Care Facility v Wing,* 94 NY2d 284, 290-291 [1999] [citations and internal quotation marks omitted]). Here, it would have been rational for the Legislature to determine that certain racetrack communities were in greater need of the potential revenue that would be generated by the video lottery than others and, as a result, not require those areas to get prior local approval.

### Reinvestment of Video Lottery Revenues

Defendants cross-appeal, arguing that part C is constitutional in all respects. Specifically, they assert that the revenue distribution provision requiring reinvestment in breeding funds and for the enhancement of purses is constitutional and, even if it is not, that the reinvestment provision is severable.

Part C provided for the allocation of revenue from the video lottery. The funds used to pay out prizes must be no less than 90% of video lottery sales (L 2001, ch 383, part C, § 2). Fifteen percent of the remaining revenue—after the prizes were paid—was allocated to the Division of the Lottery for administrative and operating expenses (L 2001, ch 383, part C, § 2, codified at Tax Law § 1612 [a] [5] [A]). The legislation also authorized a vendor's fee for the track operator of between 12% and 25% of the revenue remaining after prizes (L 2001, ch 383, part C, § 2, codified at Tax Law § 1612 [a] [5] [A]).[10] Further, a portion of the vendor's fee was required to be reinvested to enhance purses and for distribution to an appropriate breeding fund (L 2001, ch 383, part C, § 2, codified at Tax Law § 1612 [a] [5] [B]). Specifically, 35% of the vendor's fee for the first year, and 45% beginning the second year, was allocated to enhance purses, and no less than 5% of the vendor's fee was apportioned to an appropriate breeding fund.

---

**10.** This section was amended in 2003 to change the distribution of revenue to allot 10% to the Division and 29% to the track operator as a vendor's fee. The portion of the vendor's fee dedicated to enhancing purses was changed to 25.9% for the first three years, 26.7% for the next two years and 34.5% for each year after that. The percentage of the vendor's fee contributed to the breeding fund was also changed to 4.3% for the first five years and 5.2% for each subsequent year (L 2003, ch 63, part W, §§ 2, 3).

■ The statute has been very recently amended (L 2005, ch 61, part CC, § 2).[11] The repeal of the reinvestment provisions, however, does not render our consideration of this issue moot. This new legislation is prospective only, in that it "shall take effect immediately" (L 2005, ch 61, part CC, § 6). As a result, an actual controversy remains as to the constitutional validity of the reinvestment provision of part C of chapter 383 of the Laws of 2001, for the payments that have already been made under Tax Law § 1612 (c) (1).

■ We hold that the reinvestment provision of part C is constitutional. The Constitution requires that the net proceeds from the sale of lottery tickets "shall be applied exclusively to or in aid or support of education in the state as the legislature may prescribe" (NY Const, art I, § 9 [1]). "Net proceeds" means gross proceeds less any appropriate charges and expenses. It is for the Legislature to determine the necessary expenses incurred in operation of the lottery and, thus, what remaining portion of the total lottery revenue will constitute net proceeds. Here, the Legislature has prescribed that net proceeds consists of all money remaining after the payment of administrative expenses, including the vendor fee.

Plaintiffs misapprehend the nature of the reinvested funds. These moneys are not a separate deduction, beyond other costs and expenses, from the amount paid to the racetracks as a vendor fee. Rather, they constitute simply a part of the vendor fee itself—but a part whose use the State has decided to regulate. Thus, with respect to the fees earned by the racetracks, the State, which heavily regulates the racing industry, has made a policy determination that the tracks cannot simply retain as profit their entire fee after payment of costs, but must reinvest a percentage back in the industry itself. Placing such restrictions on the use of the tracks' earned profits is a common practice in the racing industry. Many statutes that allow for revenues to the racetracks from various activities require that a

11. The recent amendment removes the revenue distribution provisions that required portions of the vendor's fee to be allocated to enhancing purses and an appropriate breeding fund. The new statute increases the vendor's fee to "thirty-two percent for the first fifty million dollars annually, twenty-nine percent for the next hundred million dollars annually, and twenty-six percent thereafter" (L 2005, ch 61, part CC, § 2, amending Tax Law § 1612 [b]). The legislation further provides for "an additional vendor's marketing allowance . . . to be used by the vendor track for the marketing and promotion and associated costs of its video lottery gaming operations" (L 2005, ch 61, part CC, § 2).

specified portion of those permitted revenues be reinvested in this way (see e.g. Racing, Pari-Mutuel Wagering and Breeding Law § 229 [1] [b] [50% of compensation received by nonprofit racing association or corporation from simulcasting or wagering outside New York to be distributed to purses]; § 318 [1] [a] [ii] [percentages of total pool resulting from on-track harness racing bets to be used exclusively for purses]; § 527 [3] [a] [50% of portion of retained commission on off-track pools distributed to racing associations and corporations to be used exclusively for increasing purses]; § 527 [1] [20% of "breaks" derived from bets on off-track bets on harness races and 50% of "breaks" of other races to be paid to breeders' funds]).

The revenue to be reinvested belongs to the racetracks in the first instance. Since the vendor fee that must be paid to the tracks is a cost to the State, the reinvestment requirement imposes an administrative cost on the racetracks, not on the State Division of the Lottery. But net proceeds of the lottery are proceeds remaining after costs to the Division, not to the racetracks.

The Legislature's decision to regulate the racetracks in this way reflects a policy determination constitutionally within its purview. The Legislature was entitled to determine first, that mandatory reinvestment of a certain percentage of the racetracks' profits in enhanced purses and breeding funds would improve the health of the racing industry, declining in recent years,[12] and second, that a revitalized racing industry would attract more visitors to the racetracks—where VLTs were to be located—who would in turn participate in increased video lottery gaming, thus raising additional revenue for education.

A vendor's fee, offered not only as reimbursement but also as an incentive for the vendor to offer lottery tickets for sale on

---

**12.** In this regard, defendants contend that in recent years, since the New York racetracks, facing declining revenues, have been unable to offer large enough purses to attract quality horses, the top horses have been drawn instead to races in other states. Because high-quality horses lead to better-quality racing which in turn attracts more spectators, fewer people have been coming to the New York tracks to bet, resulting in less money spent from which to pay purses, attracting fewer players still. Similarly, breeding funds are used in part to improve the quality of the horses that are bred, and therefore raced, here in New York (see Saratoga Harness Racing Assn. v Agriculture & N.Y. State Horse Breeding Dev. Fund, 22 NY2d 119, 123 [1968] [breeding funds are "the instrument through which the Legislature has chosen to effectuate (the) legitimate public interest and purpose" of applying a portion of the revenues from racing to the "general improvement of the sport and the facilities used"]).

the vendor's premises, is a necessary administrative cost of operating the lottery, because if there is no one to sell tickets (or operate VLTs), there will be no lottery, and ultimately no money earned for education. Indeed, part C expressly contemplated that the vendor's fee to be established would "ensure the maximum lottery support for education while also ensuring the effective implementation of [Tax Law § 1617-a (authorizing the operation of the video lottery)] through the provision of reasonable reimbursements and compensation to vendor tracks for participation in such pilot program" (L 2001, ch 383, part C, § 2). The policy determination by the Legislature that the enacted allocation of funds would result in the greatest benefit to education was properly its to make.

It is generally not for the courts to determine whether a particular vendor's fee set by the Legislature is reasonable. While we can perhaps imagine a case where a "fee" was so excessive as to constitute nothing more than a flagrant end run around the requirement that the net proceeds of the lottery be applied exclusively to education, the fee at issue here does not begin to approach that standard. Every lottery ticket agent in the state receives a fee of 6% of total ticket sales (*see* 21 NYCRR 2805.10), far higher than the fee paid to the racetracks under part C. Indeed, as originally enacted, the vendor fee was to be fixed by the Division of the Lottery at between 1.2% and 2.5%.[13] After conducting a study and comparing the rates with those fixed by other states, the Division set the rate at the highest permissible level—2.5%. At that level, however, not a single racetrack signed up to participate in the video lottery pilot program.[14] The Legislature therefore amended the statute to allow for a fixed percentage of 2.9% (a portion of which was to be reinvested).[15] Still, New York's vendor fee remains significantly lower than

---

**13.** Part C set the vendor's fee at between 12% and 25% of the total revenue wagered less the amount paid for prizes (*see* L 2001, ch 383, part C, § 2). Since the prize payout is to be no less than 90% of total sales (*see* L 2001, ch 383, part C, § 2), the fee amounts to between 1.2% and 2.5% of gross sales.

**14.** The initial capital investment and continued operating costs of offering video lottery gaming can be significant. The vendor must provide space for the terminals, install and maintain them, and provide increased staff, parking and security for the VLT area. Finger Lakes Racetrack, for example, anticipated its costs of construction, new employees and a variety of other improvements to be nearly $11 million, none of which would be incurred by the State.

**15.** The 2003 amendment increased the vendor's fee to 29% of total revenue wagered less the amount paid for prizes—or 2.9% of gross sales (*see* L 2003, ch 63, part W, § 3). The 2005 amendment has increased the vendor's fee

that of other states offering VLTs at racetracks. Thus, we disagree with the Appellate Division that the vendor's fee set by the Legislature was "inflated," and find part C of chapter 383 of the Laws of 2001 constitutional in its entirety.

## Mega Millions

Finally, plaintiffs challenge the constitutionality of part D of chapter 383 of the Laws of 2001. Pursuant to this legislation, authorizing the Division of the Lottery to "enter into an agreement with a government-authorized group of one or more other jurisdictions providing for the operation and administration of a joint, multi-jurisdiction, and out-of-state lottery" (L 2001, ch 383, part D, § 3, codified at Tax Law § 1617). New York entered into an agreement with nine other states to participate in Mega Millions.[16] As noted above, the State Constitution prohibits lotteries in general, but makes an exception for lotteries "operated by the state" (NY Const, art I, § 9 [1]).

The Mega Millions agreement specifically provides that the revenue generated by the lottery within each state remains in that state for distribution according to that jurisdiction's relevant requirements. The states agreed to operate the lottery jointly—including sharing start-up costs and operating expenses. As for the responsibility of paying out prize money, each state is liable for a percentage of its sales proportionate to the total amount of sales. The agreement further provides that the laws of the state will control in the event of any conflict between state law and the Mega Millions agreement. Any claims or litigation involving tickets sold in New York must be determined under New York law. No state will be held accountable for the negligent actions or omissions of the agents or employees of another state lottery. Each state is also permitted to withdraw from the Mega Millions agreement either upon six months' notice or immediately if the withdrawal is by operation of law.

Plaintiffs make two arguments in support of their position. First, they argue that the multistate lottery is not "operated by the state" as required by the Constitution (NY Const, art I, § 9 [1]). Next, they assert that the net proceeds are not "applied exclusively to or in aid or support of education in this state" (NY Const, art I, § 9 [1]). We address these arguments in turn.

---

to between 2.6% and 3.2% of gross sales, varying as the revenue increases (*see* L 2005, ch 61, part CC, § 2).

   **16.** The other states are Georgia, Illinois, Maryland, Massachusetts, Michigan, Virginia, New Jersey, Ohio and Washington.

Although several jurisdictions are involved, New York retains sufficient control over the sale of Mega Millions tickets so that it operates the lottery within the state. According to both the terms of the Mega Millions agreement and the Tax Law, New York retains the authority to specify where and in what manner the lottery tickets may be sold (*see* Tax Law § 1604 [a] [6], [7]). The Division of the Lottery also has the power to license ticket agents and determine the manner and amount of compensation due to such agents (*see* Tax Law § 1604 [a] [9]; [b]). The Mega Millions procedures comply with New York law and, if at any time they no longer comply, the State is free to withdraw from the agreement.

█ That other states share in certain administrative costs and functions does not change our conclusion. The Division of the Lottery regularly contracts with outside vendors and other entities for various equipment and services to assist in the operation of the state lottery. Although different states operate different aspects of the multistate lottery,[17] that does not change New York's operation of Mega Millions within the state. While the State may not have exclusive control over every aspect of the Mega Millions lottery, it operates the multistate lottery within New York as required by the Constitution (*see* art I, § 9 [1]).[18]

Next, we address whether the net proceeds from Mega Millions are "applied exclusively to or in aid or support of education in this state" (NY Const, art I, § 9 [1]). Net proceeds are reasonably understood as the amount of revenue remaining after the distribution of prize money and necessary administra-

---

**17.** For example, the Virginia Lottery maintains the grand prize funds and the Georgia Lottery Corporation conducts the actual drawing.

**18.** Other courts have addressed the constitutionality of a state's participation in a multistate lottery (*see State ex rel. Ohio Roundtable v Taft*, 2003 WL 21470307, 2003 Ohio App LEXIS 3042 [2003], *appeal not allowed* 100 Ohio St 3d 1484, 798 NE2d 1093 [2003]; *Tichenor v Missouri State Lottery Commn.*, 742 SW2d 170 [Mo 1988]). *Ohio Roundtable* specifically addressed the propriety of the Mega Millions agreement against a state constitutional provision allowing "an agency of the state to conduct lotteries" (Ohio Const, art XV, § 6; *see Ohio Roundtable*, 2003 WL 21470307, *3, 2003 Ohio App LEXIS 3042, *9). The court did not find any significant difference between the State contracting with private entities to implement its in-state lottery games and contracting with other states to implement Mega Millions (*Ohio Roundtable*, 2003 WL 21470307, *6, 2003 Ohio App LEXIS 3042, *18). Ohio retained a sufficient amount of control over the lottery—since it was conducted in accordance with the State's regulations—to satisfy the Ohio Constitution (*see Ohio Roundtable*, 2003 WL 21470307, *8, 2003 Ohio App LEXIS 3042, *21; *see also Tichenor*, 742 SW2d at 174).

tive expenses (*see* Tax Law § 1619 [j] [2]). The Mega Millions agreement specifies that the states will share equally in any joint start-up and operating costs. As the Appellate Division determined, the expenses paid by New York are used to satisfy the actual administrative costs of operating the multistate lottery. There is no indication that the funds are used to advance the governmental purposes of other states (*see Dalton*, 11 AD3d at 106). Thus, the necessary net proceeds, less the required administrative expenses, remain in New York and are appropriately dedicated to education within the state. Thus, we reject plaintiffs arguments that part D is unconstitutional.

Plaintiffs' final argument that the Governor's message of necessity was unconstitutional under New York Constitution, article III, § 14 is without merit (*see Maybee v State of New York*, 4 NY3d 415 [2005]).

In conclusion, we hold parts B, C and D of chapter 383 of the Laws of 2001 to be constitutional. Plaintiffs have failed to meet their burden of proving beyond a reasonable doubt the invalidity of the legislation. As to Indian gaming compacts, since "as a matter of criminal law and public policy" class III gaming activity is not prohibited in New York, and although heavily regulated, it is permitted for charitable and other purposes, IGRA's mandate allows the State to play an important and essential role in regulating gambling on Indian lands. Allowing video lottery terminals and participation in Mega Millions further promotes the State's public policy to increase funding for education via state-sponsored lotteries. We find no constitutional infirmity in the legislation. Although some may argue the wisdom of the policy choice, the Legislature has made a valid legislative judgment.

Accordingly, the order of the Appellate Division should be modified, with costs to defendants, by declaring part C of chapter 383 of the Laws of 2001 constitutional and, as so modified, affirmed.

G.B. SMITH, J. (dissenting in part). Article I, § 9 of the New York State Constitution prohibits the Legislature from enacting legislation authorizing commercialized gambling and directs the Legislature to pass laws preventing such gambling. In light of article I, § 9, the main issue in this case is whether the Indian Gaming Regulatory Act (IGRA) (Pub L 100-497, codified at 25 USC §§ 2701-2721 and 18 USC §§ 1166-1168) authorizes the Legislature to enact legislation, e.g., part B of chapter 383 of

the Laws of 2001, empowering the Governor to negotiate and enter into compacts with Indian tribes for the establishment and operation of commercialized gambling casinos in New York State where such casinos would ordinarily be impermissible. Based on a review of the relevant law, IGRA does not authorize the New York State Legislature to enact such legislation. Accordingly, the Legislature had absolutely no authority to enact part B of chapter 383 of the Laws of 2001. Because the Legislature does not have the authority to enact such legislation, that purported legislation has no effect. From this it follows that the Governor, who pursuant to *Saratoga County Chamber of Commerce v Pataki* (100 NY2d 801 [2003], *cert denied* 540 US 1017 [2003]) must have valid legislative approval in order to bind New York State to a tribal-state gaming compact, does not have the power to even enter into compact negotiations with Indian tribes for the establishment of "for-profit" casino gaming in New York State. Moreover, IGRA does not and cannot require or authorize the Governor to enter into such negotiations.

The majority's conclusion, that part B is constitutional, fails to adequately consider the plain language of article I, § 9, New York's statutory scheme (e.g., the General Municipal Law and Penal Law) which prohibits commercialized gambling, and New York's strong, long-standing public policy against such gambling as reflected in making article I, § 9 a part of the Bill of Rights of the New York State Constitution. Most importantly, the majority's conclusion bypasses the citizens of New York State who have expressed their opposition to commercial gambling and who have not had their say, one way or the other, via the amendment process, as to whether the Legislature should be given the authority to enact legislation allowing for the type of commercialized, casino gambling contemplated under part B. I, therefore, dissent and would hold that: (1) part B of chapter 383 is unconstitutional; (2) any compact(s), entered into pursuant to part B of chapter 383, are void and unenforceable; (3) casinos opened and now operating pursuant to such a compact should be declared illegal;[1] and (4) the Governor and other New York State officials should be declared unauthorized to enter into

---

1. In August 2002, pursuant to part B of chapter 383, a compact was purportedly entered into by New York State and the Seneca Nation of Indians, resulting in the establishment of the Seneca Niagara Casino and Seneca Allegany Casino. Because the subject legislation authorized the Governor to negotiate and enter into a compact, on behalf of New York State, resulting in the establishment of casinos that conduct gaming prohibited under New York

activities in furtherance of part B of chapter 383 (e.g., any compact negotiations should cease immediately) unless and until the New York State Constitution is amended.

## Facts

### Background

The case at bar has its origins in *Saratoga County Chamber of Commerce v Pataki* (*supra*). In 1993, then Governor Mario Cuomo, under the auspices of IGRA but without legislative authorization, entered into a tribal-state compact with the St. Regis Mohawk Tribe allowing the Tribe to establish a class III commercialized gambling casino at its Akwesasne reservation in upstate New York. This Court initially held that "IGRA does not preempt state law governing which state actors are competent to negotiate and agree to gaming compacts" (*Saratoga County*, 100 NY2d at 822).[2] Additionally, this Court (1) concluded that the negotiation of tribal-state compacts involves issues affecting the health and welfare of state residents, implicating policy choices within the power of the Legislature; (2) ruled that the Governor, by acting without legislative authorization, had violated the separation-of-powers doctrine; and (3) declared the 1993 compact void and unenforceable. *Saratoga County* specifically left open the following question: would such a compact, assuming that the Governor had authorization to enter into it, violate article I, § 9 of the New York State Constitution (*see Saratoga County*, 100 NY2d at 824-825). However, the first question that must be answered is whether the Legislature, in light of the limitations on legislative power set forth in article I, § 9 of the New York State Constitution, has the authority to pass a law (e.g., part B of chapter 383) empowering the Governor to negotiate and enter into compacts for the establishment of gaming prohibited under the State Constitution.[3] As indicated above, that question must be answered in the negative.

---

law, this compact must be deemed unenforceable. Moreover, in the absence of a valid compact, the class III casino-style gaming conducted at these facilities is not lawful (*see* 25 USC § 2710 [d] [1] [C]; *Seminole Tribe of Fla. v Florida*, 517 US 44 [1996]). Thus, the casinos would have to cease operations with respect to the unlawful gaming activity.

2. This Court noted that IGRA "identifies no particular state actor who shall negotiate the compacts; that question is left up to state law (*see Pueblo of Santa Ana v Kelly*, 104 F3d 1546, 1557 [10th Cir 1997], *cert denied* 522 US 807 [1997])" (*id.*).

3. The *Saratoga County* court never reached that question.

Part B of Chapter 383 of the Laws of 2001

In October 2001, the State Legislature met in an emergency session to consider measures to assist those devastated by the September 11, 2001 World Trade Center disaster, promote economic development in the state and generate revenue. Late in the session, each branch of the Legislature considered an omnibus, 81-page bill containing 27 distinct parts, including three parts relating to gambling (2001 NY Senate-Assembly Bill S 5828, A 9459).[4] During the Senate and Assembly debates on these bills, legislators discussed a number of items, including, but not limited to, (1) the process by which the bills came before them (each bill was accompanied by a message of necessity and an immediate vote was required after the debate), (2) the relatively short time that they had to consider the important and wide-sweeping bills, the proposed gambling provisions, especially part B, which were touted as a means of generating revenue and criticized both generally as a drastic departure from New York's policy against commercial gambling and specifically regarding the evils associated with such gambling,[5] (3) the fact that many rank and file legislators were left in the dark regarding the decision-making process on these provisions (e.g., some legislators commented that there were no public hearings or conference committees for the proposed gambling measures), and (4) the fact that a number of legislators indicated that they would vote to pass the bills because, although they did not necessarily agree with the proposed gambling measures, they fully supported other proposed measures, including those which provided for low cost electricity to businesses dislocated as a result of the destruction of the World Trade Center, an expansion of the Child Health Plus system, Urban Development Corporation loan guarantees, and the creation of liberty zones for the World Trade Center Disaster Area.

On October 24 and 25, 2001, the Legislature passed these bills, which became chapter 383 of the Laws of 2001. This case

---

4. Under part B of the proposed legislation, the Governor would receive the authority to enter into tribal-state compacts for the establishment of up to six new casinos on Indian lands. Under part C, the Division of the Lottery (Division) would be permitted to license the operation of video lottery terminals at pari-mutuel racetracks. Under part D, the Division would be allowed to participate in any joint, multijurisdiction, out-of-state lottery game adopted in accordance with the existing statutory requirements for lottery planning and reporting.

5. For example, Senator Duane referred to gambling as a "tax on the poor."

involves a challenge to the constitutionality of parts B, C and D of chapter 383. However, for purposes of this opinion, I focus on part B of chapter 383 of the Laws of 2001 which: (1) provides that the Governor "may execute a tribal-state compact with the Seneca Nation of Indians pursuant to [IGRA] consistent with a memorandum of understanding [MOU] between the governor and the president of the Seneca Nation of Indians executed on June [20, 2001]" (Executive Law § 12 [a]);[6] (2) permits the Governor to execute tribal-state gaming compacts "authorizing up to three class III gaming facilities in the counties of Sullivan and Ulster" (Executive Law § 12 [b]);[7] and (3) provides that, "[p]ossession of a slot machine shall not be unlawful where such possession and use is pursuant to a gaming compact, duly executed by the governor and an Indian tribe or Nation, under [IGRA] . . ." (Penal Law § 225.30 [b]).

On August 18, 2002, the Seneca Nation of Indians entered into a compact with New York State.[8] To date, two casinos have been built pursuant to this compact. On or about December 31, 2002, the Seneca Niagara Casino in Niagara Falls, New York opened for business (see Brief for Park Place Entertainment Corporation, at 24; Seneca Gaming Corporation Company Overview, <http://www.senecagamingcorporation.com/companyoverview.html>, cached at <http://www.courts.state.ny.us/reporter/webdocs/SenecaGamingCorpCoOverview.htm>). On or about May 1, 2004, the Seneca Allegany Casino in Salamanca, New York opened for business (see Seneca

---

**6.** Under the MOU, up to three "Class III" casinos were provided for. One was to be located in Niagara County in the City of Niagara Falls. One was to be located in Erie County in the City of Buffalo. Finally, the MOU provided for "the establishment of Class III gaming on current reservation territory, should the Nation at some point in the future decide to pursue such a facility, with the precise location to be determined by the Nation at such later date" (Record on Appeal, at 156-157).

**7.** Here, the Indian tribes have not been determined and the casino locations were not specified.

**8.** The Tribal-State Compact states, in pertinent part:
"This Compact is made and entered into between the Seneca Nation of Indians, a sovereign Indian nation ('Nation') and the State of New York ('State') pursuant to the provisions of [IGRA]
. . .
"NOW, THEREFORE, the NATION and the STATE, consistent with the Memorandum of Understanding between the State Governor and the President of the Seneca Nation of Indians executed on June 20th 2001, and in consideration of the undertakings and agreements hereinafter set forth, hereby enter into this Class III Gaming Compact."

Gaming Corporation Company Overview). Both casinos are currently operating.

Procedural History and Parties

On January 29, 2002, the instant declaratory judgment actions were filed in Supreme Court, Albany County.[9] Plaintiffs in both actions allege that: (1) parts B, C and D of chapter 383 violate article I, § 9, which basically provides that the only permissible forms of gambling in New York are state-operated lotteries to raise funds for education, pari-mutuel betting on horse races, and certain games of chance operated by religious, charitable or nonprofit organizations; and (2) chapter 383 was enacted in violation of article III, § 14 of the New York State Constitution. Plaintiffs seek a declaration that parts B, C and D of chapter 383 of the Laws of 2001 are illegal, unconstitutional, and null and void, and a permanent injunction enjoining state officials and others from implementing this legislation.

After the actions were commenced, Park Place Entertainment Corporation (now known as Caesars Entertainment, Inc.) (Park Place) sought to intervene as a defendant in Action No. 1. Park Place, which described itself as "one of the world's largest gaming companies," argued that it has a substantial interest in ensuring that part B is upheld as constitutional, and that it would be adversely affected and bound by any judgment invalidating part B of chapter 383.[10] Regarding its substantial interest, Park Place asserted that in April 2000, it entered into

---

**9.** The *Dalton* action (Action No. 1) was commenced on behalf of a broad coalition of citizen taxpayer-voters (Joseph Dalton, Reverend Duane Motley, Mr. Lee Karr, G. Stanford Bratton, Reverend John Ekman and Chaskiel Rozenburg), state legislators (Senator Frank Padavan and Assembly Member William Parment) and organizations (New Yorkers for Constitutional Freedoms, Ltd., the Coalition Against Casino Gambling and the Presbyterian and New England Congregational Church) opposed to the spread of gambling throughout New York State. The *Karr* action (Action No. 2) was brought on behalf of Mrs. Lee Karr, a citizen taxpayer-voter opposed to the spread of gambling throughout New York State.

The defendants in both actions were: Governor George Pataki, the State of New York, the New York State Racing and Wagering Board, Arthur J. Roth, as Commissioner of Taxation and Finance of the State of New York, the Division of the Lottery, New York State Comptroller H. Carl McCall, New York State Racing Association, Finger Lakes Racing Association, Yonkers Racing Corporation, Mid-State Raceway, Inc. and Monticello Raceway Management, Incorporated.

Note, by stipulation of discontinuance dated November 21, 2002, both actions were discontinued with prejudice only as to defendant H. Carl McCall.

**10.** When asked about its interest in this matter during oral argument, Park Place noted that under IGRA, Indian tribes may enter into management

an agreement with the St. Regis Mohawk Tribe under which Park Place secured exclusive development and management rights for the Tribe's future casinos in New York State. Further, Park Place asserted that it entered into an agreement for an option to acquire property (i.e., Kutsher's Resort Hotel and Country Club) in Sullivan County, New York in order to build a casino at that location.[11] Finally, Park Place claims to have "expended millions of dollars in preparation for the construction and operation of this project that it expects to manage on behalf of the [Tribe]."[12] By stipulation and order dated February 15, 2002, the parties to Action No. 1 and the attorneys of Park Place agreed that Park Place may intervene in this action and shall serve a pleading answering or responding to the complaint.

In April 2002, the state defendants and Park Place each brought preanswer motions to dismiss pursuant to CPLR 3211. The state defendants moved to dismiss the complaint in its entirety and Park Place moved to dismiss the first three causes of action relating to part B of chapter 383 of the Laws of 2001. By order dated October 30, 2002, Supreme Court dismissed the motions in their entirety as premature. Further, on that date, Action Nos. 1 and 2 were consolidated and the parties were permitted to cross-move for summary judgment.

On July 17, 2003, Supreme Court granted summary judgment in defendants' favor. The court upheld the constitutionality of parts B, C and D of chapter 383, and dismissed the complaints in their entirety. The court held that the State Constitution po-

---

contracts with experienced companies, like Park Place, to assist in managing the Indian gaming operations. Park Place also noted that a stated purpose of IGRA is to promote the economic development of the tribe, that the monies generated from the gaming activities are used towards that end, and that it is in the tribes' interest to affiliate themselves with experienced management companies.

**11.** Park Place asserted that in March 2001, "the Mohawks filed a Land-Into-Trust application with the Bureau of Indian Affairs of the U.S. Department of the Interior to have 66 acres of the Kutsher's land under option to Park Place taken into trust for the Mohawks to be used for Indian gaming purposes" (Record on Appeal, at 312). According to the record, this application is still pending.

**12.** It is telling that one of the largest casino developers/operators/managers has intervened in this suit. Companies, like Park Place, who have or are in the process of developing Indian casinos in New York State stand to lose quite a bit of money if part B of chapter 383 is struck down and they are unable to: (1) recoup their initial investment in the development of the casinos; and (2) reap the benefits (e.g., management fees) for operating and/or managing the open casinos.

ses no bar to Indian casino gaming in New York because "New Yorkers have adopted a public policy that permits considerable gambling, although regulated." In so holding, the court adopted the Second Circuit's holding in *Mashantucket Pequot Tribe v State of Conn.* (913 F2d 1024 [2d Cir 1990] [ruling that states that allow charities to conduct class III gaming must negotiate in good faith with a tribe wishing to do the same]) and the analysis from Judge Read's dissent in *Saratoga County*.[13]

On July 7, 2004, the Appellate Division, Third Department modified the Supreme Court's order. The Court affirmed the Supreme Court's ruling regarding the constitutionality of parts B and D of chapter 383 of the Laws of 2001; however, it declared that part C was unconstitutional. Regarding part B, the Court determined that,

> "pursuant to IGRA, a state may enter into tribal-state compacts permitting particular class III, casino-type gaming activities on tribal lands if the state permits any person to conduct those particular gaming activities for any purpose, including a charitable purpose. That a compact permits a certain game to be conducted in a manner that is otherwise inconsistent with state law will not render it invalid if the game is not completely prohibited. Because New York permits the gaming activities at issue here for charitable purposes, subject to heavy regulation, the gaming is properly the subject of a tribal-state compact" (*Dalton v Pataki*, 11 AD3d 62, 67 [3d Dept 2004]).

Moreover, the Court held that the Governor would be able to negotiate tribal-state compacts with Indian tribes to conduct casino-style gaming on lands that were not "Indian lands" at the time of IGRA's enactment if the Governor concurs with the Secretary of the Interior's determination that casino gambling would be in the best interest of the Indian tribe and not detrimental to the surrounding communities.

Plaintiffs and defendants appeal and cross-appeal, respectively, pursuant to CPLR 5601 (b) (1).

## Discussion

By holding that part B of chapter 383 of the Laws of 2001 is constitutional, the majority of this Court and the lower courts

---

**13.** According to Judge Read, "IGRA mandates that, if a state allows *any* class III gaming by *any* person, a tribe may seek to conduct the same games on its lands" (*Saratoga County*, 100 NY2d at 842).

have basically held that Congress can require the New York State Legislature to pass a law it ordinarily could not, i.e., a law empowering the Governor to enter an agreement for the establishment of gambling activity that does not comport with this State's Constitution. Since the gambling activity at issue here has not been put before and approved by the citizens of New York as an exception to the general prohibition against gambling set forth in article I, § 9 of the New York State Constitution, the Legislature cannot pass legislation authorizing the Governor to enter into agreements for the establishment of commercial gambling facilities. Therefore, part B of chapter 383 must be set aside as unconstitutional.[14]

Background and Purpose of the Indian Gaming Regulatory Act

Congress passed IGRA on October 17, 1988, pursuant to its power to regulate commerce "with the Indian Tribes" (US Const, art I, § 8 [3]) and in response to the United States Supreme Court's decision in *California v Cabazon Band of Mission Indians* (480 US 202 [1987]). In *Cabazon*, which was decided about a year before IGRA was enacted, the Supreme Court held that a state which regulates rather than prohibits gambling must permit Indian tribes to conduct gambling on their lands (*see, Cabazon*, 480 US at 209). The Court further held that Indian tribes would be forbidden from conducting gambling if a particular state prohibits such gambling altogether (*id.*). To deal with this regulatory/prohibitory distinction, the *Cabazon* court stated: "The shorthand test is whether the conduct at issue violates the State's public policy." (*Cabazon*, 480 US at 209.) The primary purpose of IGRA is "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" (25 USC § 2702 [1]).[15]

IGRA divides gaming on Indian lands into three classes.[16] Class I games, defined as social games for minimal prizes and

---

14. That is, Executive Law § 12 and the amendments to Penal Law § 225.30 (a) (1) and (b) must be set aside as unconstitutional.

15. IGRA also attempts to regulate the gaming so as to avoid "corrupting influences" and seeks to ensure that the Indian tribes are the primary beneficiaries of the gaming (*see* 25 USC § 2702 [2]).

16. "The term 'Indian lands' means—

"(A) all lands within the limits of any Indian reservation; and

"(B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by

traditional Indian or ceremonial games, are within the exclusive jurisdiction of the Indian tribes and shall not be subject to the provisions of IGRA (*see* 25 USC § 2703 [6]; § 2710 [a] [1]). Class II games, such as bingo, lotto, pull tabs, tip jars, punch boards and card games, but not banking card games (e.g., chemin de fer, baccarat and blackjack), fall within tribal jurisdiction but are subject to the provisions of IGRA (*see* 25 USC § 2703 [7]; § 2710 [a] [2]). Class III gaming, which is defined as "all forms of gaming that are not class I or class II gaming" (25 USC § 2703 [8]) and includes banking cards, horse racing, slot machines and the commercialized, casino gambling at issue here, is subject to the terms and conditions of tribal-state compacts.

Requirements for Class III Gaming

IGRA provides,

> "Class III gaming activities shall be lawful on Indian lands only if such activities are—
>
> "(A) authorized by an ordinance or resolution that—
>
> "(i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,
>
> "(ii) meets the requirements of subsection (b) of this section, and
>
> "(iii) is approved by the Chairman,
>
> "(B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and

---

> any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power" (25 USC § 2703 [4]).

Generally, gaming on lands acquired after October 17, 1988 by the Secretary of the Interior and held "in trust for the benefit of an Indian tribe," except for "lands . . . located within or contiguous to the boundaries of [an Indian] reservation," is not permitted (25 USC § 2719 [a] [1]). However, IGRA authorizes gaming on Indian lands acquired after October 17, 1988 if the Secretary of the Interior,

> "after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination" (25 USC § 2719 [b] [1] [A]).

"(C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect" (25 USC § 2710 [d] [1]).[17]

In determining whether class III gaming will be allowable on Indian lands, the tribal-state compacting requirement is of primary importance under IGRA. However, before discussing this requirement, it is necessary to examine IGRA's legislative history regarding compacts because this history makes clear that Congress: (1) considers a state and Indian tribe engaged in compact negotiations to be equal sovereigns; (2) considers the state's interest, in ensuring that its law and public policy are adhered to, important to the compacting process; and (3) does not require a state to abandon its own constitution or laws in order to have or regulate class III gaming. The Senate Report, which accompanied the bill (US Senate Bill S 555) that eventually became IGRA and sets forth IGRA's legislative history, provides, in pertinent part:

> "*Class III—tribal-State compacts. . . .* [T]he [Select Committee on Indian Affairs (Committee)] concluded that the use of compacts between tribes and states is the best mechanism to assure that the interests of both sovereign entities are met with respect to the regulation of complex gaming enterprises such as pari-mutuel horse and dog racing, casino gaming, jai alai and so forth. The Committee notes the strong concerns of states that state laws and regulations relating to sophisticated forms of class III gaming be respected on Indian lands where,

---

**17.** According to its legislative history, IGRA "is intended to expressly preempt the field in the governance of gaming activities on Indian lands" (S Rep No. 100-446, 100th Cong, 2d Sess, Statement of Policy, at 6). However, with regard to class III gaming, Congress contemplated that such gaming on Indian lands would only be permissible if states and Indian tribes employed a system of compacts for the regulation of such gaming (*id.*). Under this system of compacts, the federal government cedes regulatory oversight authority as to class III gaming conducted on Indian lands and permits states and Indian tribes to jointly regulate such gaming. This system exists so that the respective interests of the state and tribe (i.e., two equal sovereigns) will be taken into account. Moreover, there can be no class III gaming on Indian lands without a valid tribal-state compact (*see* 25 USC § 2710 [d] [1] [C]) in a state that permits the specific gaming, set forth in the compact, for any purpose by any person, organization, or entity (*see* 25 USC § 2710 [d] [1] [B]). Thus, through tribal-state compacts, states maintain "some measure of authority over gaming on Indian lands" (*Seminole Tribe*, 517 US at 58).

with few exceptions, such laws and regulations do not now apply. The Committee balanced these concerns against the strong tribal opposition to any imposition of State jurisdiction over activities on Indian lands. The Committee concluded that the compact process is a viable mechanism for setting various matters between two equal sovereigns" (S Rep No. 100-446, 100th Cong, 2d Sess, Explanation of Major Provisions, at 13).

The Senate Report further provides that:

"both State and tribal governments have significant governmental interests in the conduct of class III gaming. *States and tribes are encouraged to conduct negotiations within the context of the mutual benefits that can flow to and from tribe and States. This is a strong and serious presumption that must provide the framework for negotiations.* A tribe's governmental interests include raising revenues to provide governmental services for the benefit of the tribal community and reservation residents, promoting public safety as well as law and order on tribal lands, realizing the objectives of economic self-sufficiency and Indian self-determination, and regulating activities of persons within its jurisdictional borders. *A State's governmental interests with respect to class III gaming on Indian lands include the interplay of such gaming with the State's public policy, safety, law and other interests, as well as impacts on the State's regulatory system,* including its economic interest in raising revenue for its citizens" (*id.* [emphasis added]).

Regarding the Committee's intent, the Senate Report provides that:

"It is the Committee's intent that the compact requirement for class III not be used as a justification by a State for excluding Indian tribes from such gaming or for the protection of other State-licensed gaming enterprises from free market competition with Indian tribes" (*id.*).

Further, *"States are not required to forgo any State governmental rights to engage in or regulate class III gaming except whatever they may voluntarily cede to a tribe under a compact"* (*id.* at 14 [emphasis added]).

With respect to the tribal-state compact requirement, IGRA provides that an Indian tribe, seeking to conduct class III gaming on its land, may initiate the compacting process by asking the state in which the proposed activity is to take place to engage in negotiations for the purpose of entering a tribal-state compact (*see* 25 USC § 2710 [d] [3] [A]). When the tribe requests a state to enter into compact negotiations, both the tribe and the state shall negotiate in good faith (*id.*).[18] However, IGRA does not require that a state accept or enter into a compact. Moreover, class III gaming shall not be imposed on states where such gaming is forbidden. 25 USC § 2701 (5) provides:

"Indian tribes have the exclusive right to regulate

---

**18.** IGRA provides that, "The United States district courts shall have jurisdiction over . . . any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact under [25 USC § 2710 (d) (3) (A)] or to conduct such negotiations in good faith" (25 USC § 2710 [d] [7] [A] [i]). Note, the United States Supreme Court has held that the Indian Commerce Clause does not grant Congress the power to abrogate the states' sovereign immunity from suit through 25 USC § 2710 (d) (7), "and therefore § 2710 (d) (7) cannot grant jurisdiction over a State that does not consent to be sued" (*Seminole Tribe*, 517 US at 47).

Further, where an Indian tribe introduces evidence that it requested a state to enter compact negotiations more than 180 days before, no tribal-state compact was entered into, and the state did not respond to the Indian tribe's request for compact negotiations or did not respond in good faith, the burden of proof shifts to the state to prove that it negotiated in good faith (*see* 25 USC § 2710 [d] [7] [B] [i], [ii]).

"[I]f . . . the court finds that the State has failed to negotiate in good faith . . . , the court shall order the State and [ ] Indian [t]ribe to conclude such a compact within a 60-day period" (25 USC § 2710 [d] [7] [B] [iii]). Further, "If a State and an Indian tribe fail to conclude a Tribal-State compact . . . [after 60 days], the Indian tribe and the State shall each submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact. The mediator shall select . . . the one which best comports with [IGRA and other applicable federal law]" and submit the selected compact to the state and Indian tribe. (25 USC § 2710 [d] [7] [B] [iv], [v].) "If a State consents to [the] proposed compact [within 60 days of the mediator's submission of the proposed compact to the State], the proposed compact shall be treated as a Tribal-State compact" (25 USC § 2710 [d] [7] [B] [vi]). However,

"If the State does not consent . . . [within 60 days], the mediator shall notify the Secretary [of the Interior] and the Secretary shall prescribe, in consultation with the Indian tribe, procedures . . .

"consistent with the proposed compact selected by the mediator . . . , [IGRA], and the relevant [state law], and . . .

"under which class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction" (25 USC § 2710 [d] [7] [B] [vii]; *see* 25 CFR part 291).

gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law *and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity*" (emphasis added).

Based on the foregoing, as long as the proposed class III gaming activity is not prohibited by a state's criminal law and public policy, an Indian tribe can initiate the tribal-state compacting process under which a state is obligated to negotiate in good faith, subject to 25 USC § 2710 (d) (7). However, in the instant case, the commercialized casino gaming contemplated is prohibited under New York law and public policy.[19]

Because the proposed casino gaming is prohibited under the New York State Constitution and Penal Law, and such gaming conflicts with New York State's strong public policy against commercialized gambling, the Legislature did not have the power to enact the instant legislation authorizing the Governor to negotiate and enter into compacts with Indian tribes for the establishment of "for-profit" casino gaming in New York State. Moreover, IGRA does not and cannot force or require the Legislature to pass a law authorizing the Governor to execute agreements for the establishment of activity that is violative of New York State's laws and public policy. As indicated above, without valid legislative approval, the Governor can neither negotiate nor bind the State by entering into a compact.

New York's Prohibition Against Commercialized Gambling

New York prohibits commercialized gambling, including the for-profit, casino gaming contemplated herein. This prohibition is set forth in the "Bill of Rights" of the New York State Constitution (*see* NY Const, art I, § 9). Article I, § 9 was adopted to "protect[ ] . . . the family man of meager resources from his own imprudence at the gaming tables" (*see International Hotels Corp. [Puerto Rico] v Golden*, 15 NY2d 9, 15 [1964], citing Carter and Stone, Reports of Proceedings and Debates of the Convention of 1821, at 567 [Hosford 1821]). Article I, § 9 (1) of the New York State Constitution reads, in pertinent part:

"except as hereinafter provided, *no lottery or the sale of lottery tickets, pool-selling, bookmaking, or any other kind of gambling, except* lotteries operated by the state and the sale of lottery tickets in con-

---

**19.** Because the instant gaming activity is prohibited, the State is under no obligation to negotiate in good faith.

nection therewith as may be authorized and prescribed by the legislature, the net proceeds of which shall be applied exclusively to or in aid or support of education in this state as the legislature may prescribe, and except pari-mutuel betting on horse races as may be prescribed by the legislature and from which the state shall derive a reasonable revenue for the support of government, *shall hereafter be authorized or allowed within this state; and the legislature shall pass appropriate laws to prevent offenses against any of the provisions of this section.*" (Emphasis supplied.)

Article I, § 9 (2) provides:

"any city, town or village within the state may by an approving vote of the majority of the qualified electors in such municipality voting on a proposition therefor submitted at a general or special election authorize, subject to state legislative supervision and control, the conduct of one or both of the following categories of games of chance commonly known as: (a) bingo or lotto, in which prizes are awarded on the basis of designated numbers or symbols on a card conforming to numbers or symbols selected at random; (b) games in which prizes are awarded on the basis of a winning number or numbers, color or colors, or symbol or symbols determined by chance from among those previously selected or played, whether determined as the result of the spinning of a wheel, a drawing or otherwise by chance."

Subdivision (2) further provides:

"If authorized, such games shall be subject to the following restrictions, among others which may be prescribed by the legislature: (1) only bona fide religious, charitable or non-profit organizations of veterans, volunteer firefighter and similar non-profit organizations shall be permitted to conduct such games; (2) the entire net proceeds of any game shall be exclusively devoted to the lawful purposes of such organizations; (3) no person except a bona fide member of any such organization shall participate in the management or operation of such game; and (4) no person shall receive any remuneration

for participating in the management or operation of any such game."

Additionally, with respect to subdivision (2):

"Unless otherwise provided by law, no single prize shall exceed two hundred fifty dollars, nor shall any series of prizes on one occasion aggregate more than one thousand dollars. The legislature shall pass appropriate laws to effectuate the purposes of this subdivision [and] ensure that such games are rigidly regulated to prevent commercialized gambling."

Consistent with this provision, the Legislature has outlawed commercialized gambling (*see* Penal Law art 225).[20]

In order to give effect to article I, § 9 of the New York State Constitution, the Legislature enacted article 9-A of the General Municipal Law, New York's "Games of Chance Licensing Law" (*see* General Municipal Law § 185 *et seq.*). The stated purpose of article 9-A is consistent with New York's legal prohibition and strong public policy against commercialized gambling. General Municipal Law § 185, which sets forth the purpose of article 9-A, provides, in pertinent part:

"The legislature hereby declares that the raising of funds for the promotion of bona fide charitable, educational, scientific, health, religious and patriotic causes and undertakings, where the beneficiaries are undetermined, is in the public interest. It hereby finds that, as conducted prior to the enactment of this article, games of chance were the subject of exploitation by professional gamblers, promoters, and commercial interests. *It is hereby declared to be the policy of the legislature that all phases of the supervision, licensing and regulation of games of chance and of the conduct of games of*

---

**20.** For example, Penal Law § 225.05 provides, "A person is guilty of promoting gambling in the second degree when he knowingly advances or profits from unlawful gambling activity." Moreover, pursuant to Penal Law § 225.00 (4), "A person 'advances gambling activity' when, acting other than as a player, he engages in conduct which materially aids any form of gambling activity. Such conduct includes but is not limited to conduct directed toward the creation or establishment of the particular game, contest, scheme, device or activity involved, toward the acquisition or maintenance of premises, paraphernalia, equipment or apparatus therefor, toward the solicitation or inducement of persons to participate therein, toward the actual conduct of the playing phases thereof, toward the arrangement of any of its financial or recording phases, or toward any other phase of its operation."

*chance, should be closely controlled and that the laws and regulations pertaining thereto should be strictly construed and rigidly enforced; that the conduct of the game and all attendant activities should be so regulated and adequate controls so instituted as to discourage commercialization of gambling in all its forms, including the rental of commercial premises for games of chance, and to ensure a maximum availability of the net proceeds of games of chance exclusively for application to the worthy causes and undertakings specified herein; that the only justification for this article is to foster and support such worthy causes and undertakings, and that the mandate of section nine of article one of the state constitution, as amended, should be carried out by rigid regulations to prevent commercialized gambling*, prevent participation by criminal and other undesirable elements and prevent the diversion of funds from the purposes herein authorized" (General Municipal Law § 185 [emphasis added]).

Similarly, the activities of the body charged with the administration of New York's Games of Chance Licensing Law, the New York State Racing and Wagering Board (Board), are consistent with New York's legal prohibition and strong public policy against commercialized gambling. General Municipal Law § 188-a (1) provides that the Board shall:

*"Supervise the administration of the games of chance licensing law and [ ] adopt, amend and repeal rules and regulations governing the issuance and amendment of licenses thereunder and the conducting of games under such licenses, which rules and regulations shall have the force and effect of law and shall be binding upon all municipalities issuing licenses, and upon licensees of the board, to the end that such licenses shall be issued to qualified licensees only, and that said games shall be fairly and properly conducted for the purposes and in the manner of the said games of chance licensing law prescribed and to prevent the games of chance thereby authorized to be conducted from being conducted for commercial purposes or purposes other than those therein authorized*, participated in by criminal or other undesirable elements and the funds derived from the games being diverted from

the purposes authorized, and to provide uniformity in the administration of said law throughout the state, the board shall prescribe forms of application for licenses, licensees, amendment of licenses, reports of the conduct of games and other matters incident to the administration of such law" (General Municipal Law § 188-a [1] [emphasis added]).

Likewise, General Municipal Law, article 9-A, § 186 (4), pertaining to the types of organizations authorized to conduct games of chance in New York State, reflects New York's strong public policy against commercialized gambling. General Municipal Law § 186 (4) provides that:

" 'Authorized organization' shall mean and include any bona fide religious or charitable organization or bona fide educational, fraternal or service organization or bona fide organization of veterans or volunteer firemen, which by its charter, certificate of incorporation, constitution, or act of the legislature, shall have among its dominant purposes one or more of the lawful purposes as defined in this article, provided that each shall operate without profit to its members, and provided that each such organization has engaged in serving one or more of the lawful purposes as defined in this article for a period of three years immediat[e]ly prior to applying for a license under this article."

It has been argued that the State Legislature had authority to enact part B of chapter 383 of the Laws of 2001 because: (1) since New York allows what is ostensibly class III gaming for charitable and other purposes, New York must allow the commercialized, for-profit casino gaming at issue here; and (2) the citizens of New York State, by approving gambling for charitable and other purposes, have thereby approved class III commercialized casino gaming. This argument is unavailing because instead of focusing on whether the New York State Constitution authorizes the Legislature to pass a law authorizing the Governor to agree to bring about unconstitutional, commercialized gambling, this argument incorrectly focuses on the noncommercial gambling New York State permits as justification for the contention that New York State can enter compacts for the establishment of commercialized gambling facilities on Indian lands. Put another way, this argument fails to consider the plain

language of article I, § 9 of the State Constitution[21] and how this constitutional provision affects the Legislature's authority, or lack thereof, to enact legislation related to commercialized gambling.

As noted above, article I, § 9 generally proscribes gambling except for lotteries where the net proceeds are applied towards education, pari-mutuel betting on horse races,[22] and games of chance to be engaged in by certain types of organizations (e.g., nonprofit organizations) and conducted for specific, limited purposes (e.g., charitable). Under article I, § 9, these games of chance are strictly regulated to ensure that they are not commercialized. For example, article I, § 9 dictates where net proceeds go, who manages or operates the game, that no person shall be paid for participating in the management or operation of the game, and prize amounts. Further, article I, § 9 (2) provides that, "The legislature shall pass appropriate laws to effectuate the purposes of this subdivision [and] ensure that such games are rigidly regulated to prevent commercialized gambling." The legislation passed, pursuant to this constitutional directive, i.e., the Games of Chance Licensing Law, similarly seeks to "discourage commercialization of gambling in all its forms, including the rental of commercial premises for games of chance, and to ensure a maximum availability of the net proceeds of games of chance exclusively for application to [ ]

---

**21.** "When language of a constitutional provision is plain and unambiguous, full effect should be given to 'the intention of the framers . . . as indicated by the language employed' and approved by the People" (*Matter of King v Cuomo*, 81 NY2d 247, 253 [1993] [citations omitted]).

While it is true that "[t]he legislative power of this state shall be vested in the senate and assembly" (NY Const, art III, § 1), this Court has stated:

"It needs no citation of authorities to sustain the postulate, that except as restrained by the Constitution, the legislative power is untrammeled and supreme, and that a constitutional provision which withdraws from the cognizance of the legislature a particular subject, or which qualifies or regulates the exercise of legislative power in respect to a particular incident of that subject, leaves all other matters and incidents under its control. Nothing is subtracted from the sum of legislative power, except that which is expressly or by necessary implication withdrawn" (*Matter of Thirty-Fourth St. R.R. Co.*, 102 NY 343, 350-351 [1886]).

**22.** Under IGRA, this activity would be categorized as class III gaming. Because this specific activity is a constitutional exception set forth in article I, § 9, the Legislature could enact a law authorizing the Governor to negotiate and ultimately enter into a compact with an Indian tribe only for the establishment of a facility where pari-mutuel betting on horse races would be conducted.

worthy causes and undertakings" (General Municipal Law § 185). Based on the foregoing, article I, § 9 of the New York State Constitution clearly prohibits gaming for commercialized purposes and commercialized games of chance, and further, acts as a limitation on the power of the Legislature to enact laws pertaining to such gaming and games of chance.[23]

Here, the Legislature, by enacting part B of chapter 383, authorized the Governor to execute tribal-state compacts for the establishment of up to six class III, for-profit casino gaming facilities on Indian lands and "after-acquired" lands pursuant to 25 USC § 2719 (b) (1) (A). There is no dispute, and the majority agrees, that the gaming facilities contemplated under this legislation (and the gaming and games to be engaged in at these facilities) are commercial in nature and fall squarely within the type of commercial gambling activity prohibited under article I, § 9.[24] Moreover, the provisions authorizing the execution of tribal-state compacts for the establishment of the above-mentioned prohibited facilities do not comport with article I, § 9.[25] Thus, in view of the limitation on the Legislature's power set forth in article I, § 9, and the axiom that where a constitu-

---

**23.** Because article I, § 9 prohibits these activities, the Legislature is restrained from passing laws allowing such activities (*see e.g., Blue Cross & Blue Shield of Cent. N.Y. v McCall*, 89 NY2d 160 [1996]). Further, since article I, § 9 does not set forth a procedure authorizing the Legislature to add further exceptions to it, it must be concluded that no such practice exists under this constitutional provision (*see e.g., Matter of King*, 81 NY2d at 252). If no such practice exists, the Legislature may not legislate as if such practice does exist (*id.*).

**24.** The types of gaming and games (games) to be conducted at the for-profit casinos provided for under part B of chapter 383 are reflected in Appendix A to the instant Tribal-State Compact. As indicated above, the compact was to be consistent with the June 20, 2001 MOU. According to the MOU, the types of gaming to be conducted are "those types of games already included in the Mohawk and Oneida gaming compacts." Thus, some of the games listed in the instant Tribal-State Compact, including baccarat, blackjack, craps and roulette are the same as those listed in the Mohawk Compact.

Regarding the games authorized under the Mohawk Compact, the Third Department stated *"that the commercialized Las Vegas style gambling authorized by the compact is the antithesis of the highly restricted and 'rigidly regulated' (NY Const, art I, § 9 [2]) forms of gambling permitted by the [New York State] Constitution and statutory law and New York's established public policy disfavoring gambling"* (*Saratoga County Chamber of Commerce v Pataki*, 293 AD2d 20, 24 [3d Dept 2002] [emphasis added and citations omitted]).

**25.** Since article I, § 9 limits the Legislature's ability to pass legislation to establish a prohibited commercialized gambling facility, it necessarily limits the Legislature's ability to pass legislation authorizing the State to enter into

tional limitation on the Legislature's power exists, a legislative enactment that seeks to exercise such power in spite of the limitation has no effect, the Legislature did not have the authority to enact part B of chapter 383 of the Laws of 2001.

In light of this conclusion, that the Legislature had no power to enact the legislation, the next question that must be answered is whether IGRA somehow grants the Legislature the authority to enact part B of chapter 383. Respondents' main argument that the Legislature had the authority to enact part B of chapter 383 is that because the New York State Constitution permits charitable and other organizations to conduct noncommercial casino-style gaming in New York State, IGRA requires that New York must negotiate with Indian tribes to give them the opportunity to conduct commercial casino-style gaming. In support of this argument, respondents rely primarily on IGRA's legislative history regarding the "for any purpose by any person" provision relating to class II gaming (S Rep No. 100-446, 100th Cong, 2d Sess, Explanation of Major Provisions, at 12),[26] and *United States v Sisseton-Wahpeton Sioux Tribe* (897 F2d 358, 365 [8th Cir 1990] [cited for the proposition that IGRA's "legislative history reveals that Congress intended to permit a particular gaming activity, even if conducted in a manner inconsistent with state law, if the state merely regulated, as opposed to completely barred, that particular gaming activity"]). Based on the foregoing, respondents concluded that "a State may not invoke state law prohibiting commercialized Class III gaming outside Indian lands to justify a refusal to undertake compact negotiations under IGRA. To the contrary, as long as a State permits class III gaming 'for any purpose by any person,' IGRA expressly requires States to 'negotiate . . . in good faith to enter into . . . a compact' and provides specific remedies where they fail to do so" (*see* Brief for State Respondents, at 44; regarding the remedies, *see* 25 USC § 2710 [d]).[27]

---

an agreement for the establishment of a prohibited commercialized gambling facility.

**26.** According to IGRA's legislative history, "The phrase 'for any purpose by any person, organization or entity' makes no distinction between State laws that allow class II gaming for charitable, commercial, or governmental purposes, or the nature of the entity conducting the gaming. If such gaming is not criminally prohibited by the State in which tribes are located, then tribes, as governments, are free to engage in such gaming." (*Id.*)

**27.** Respondents' argument, although supported by IGRA's legislative history, leads to an odd result. In *Cabazon*, the Supreme Court upheld a similar

The IGRA provisions and case law cited by respondents do not provide authorization for this State's Legislature to enact laws like part B of chapter 383. IGRA presupposes that the New York State Legislature has the authority to enact such laws.[28] However, nothing in IGRA, not the fact that IGRA preempts the field in the area of gaming on Indian lands, not the IGRA-defined role of states in the regulation of gaming on Indian lands,[29] not the requirement that states negotiate compacts in good faith, not the fact that the compact requirement is meant to take into account the interests of the tribe and state, not the fact that the Secretary of the Interior has the power to impose commercialized casino gambling if a compact is not entered into, counters the article I, § 9 limitation to the Legislature's power to enact legislation authorizing the State, through the Governor, to execute an agreement for the establishment of unconstitutional, illegal commercialized gambling. Put another

---

argument. However, Justice Stevens had reservations akin to my own, i.e., that the argument makes little sense. In a dissenting opinion, written by Justice Stevens and joined by Justices O'Connor and Scalia, Justice Stevens wrote that:

"Today the Court seems prepared to acknowledge that an Indian tribe's commercial transactions with non-Indians may violate 'the State's public policy.' . . . The Court reasons, however, that the operation of high-stakes bingo games does not run afoul of California's public policy because the State permits some forms of gambling and, specifically, some forms of bingo. I find this approach to 'public policy' curious, to say the least. The State's policy concerning gambling is to authorize certain specific gambling activities that comply with carefully defined regulation and that provide revenues either for the State itself or for certain charitable purposes, and to prohibit all unregulated commercial lotteries that are operated for private profit. To argue that the tribal bingo games comply with the public policy of California because the State permits some other gambling is tantamount to arguing that driving over 60 miles an hour is consistent with public policy because the State allows driving at speeds of up to 55 miles an hour" (*Cabazon*, 480 US at 224-225).

**28.** One problem with IGRA presupposing that a particular state has the authority to enact legislation similar to part B is that no two states have exactly the same history regarding gambling or motivations behind why all, some or no gambling is proscribed, or why a particular state chose to prohibit gambling via statute, city ordinance or bill of rights provision.

**29.** Indian nations are sovereign and IGRA allows states, through the compacting process, to gain a measure of control over gaming on Indian lands (*see Seminole Tribe*, 517 US 44 [1996]).

way, state law, not federal law, necessarily governs the exercise of the Legislature's power to enact legislation.[30]

IGRA states that "Class III gaming activities shall be lawful on Indian lands only if such activities are . . . located in a State that permits such gaming for any purpose by any person, organization, or entity" (25 USC § 2710 [d] [1] [B]). Applying Justice Stevens' reasoning to the instant case, it does not follow that if a state permits class III gaming for charitable purposes, it must permit commercial gambling on Indian lands by way of a compact in violation of a state's own constitutional provision (*Cabazon*, 480 US at 222-227 [Stevens, J., dissenting]). At most, the state would be required to permit class III gaming on Indian lands for charitable purposes. Such an interpretation would not violate the New York State Constitution. Nothing in IGRA requires the contrary. Moreover, the Constitution can be amended by the People of the State of New York.

*Mashantucket Pequot Tribe v State of Conn.* (737 F Supp 169 [1990], *affd* 913 F2d 1024 [1990]) and *California v Cabazon Band of Mission Indians* (480 US 202 [1987]), two cases heavily relied on by respondents, do not change this conclusion because these cases are neither controlling nor applicable. In *Mashantucket*, the Pequot Tribe sought to enter into negotiations with the State of Connecticut to conduct casino-type games of chance on its reservation. Connecticut's statutory scheme generally prohibited commercial gambling but permitted nonprofit organizations to conduct "Las Vegas nights" and games of chance to raise funds for the organizations. At the heart of the *Mashantucket* decision was the conclusion of both the District Court and the Second Circuit that Connecticut regulated rather than prohibited gambling and thus Connecticut was required to negotiate a compact with the Pequot Tribe. On the other hand, the instant case involves article I, § 9 of the New York State Constitution, a provision which reflects New York's long-standing policy against the type of commercialized gambling sought to be permitted here *and* acts as a limitation on the Legislature's authority to enact legislation like part B of chapter 383. (See discussion of New York's long constitutional history of prohibiting gambling in *Saratoga County Chamber of Commerce*

---

**30.** IGRA's focus is on the compact requirement, not on a legislature's power, or lack thereof, to enact legislation in a given area. Similarly, this Court's decision in *Saratoga County* (100 NY2d 801 [2003]) focused on whether the Governor had authority to compact, rather than on whether the Legislature's ability to legislate was thwarted by a constitutional limitation.

*v Pataki,* 100 NY2d 801, 826-828 [2003] [G.B. Smith, J., concurring in part and dissenting in part].) The antigambling provision is part of the supreme law of the State and can only be repealed by the People of New York State by amending the constitution (*see* NY Const, art XIX, § 1). The New York State Constitution should be accorded significantly more deference than the statutes at issue in *Mashantucket,* statutes which did not reflect as strong an antigambling policy as New York's and have since been repealed.

With respect to *Cabazon,* it should be noted that while IGRA has adopted *Cabazon* language pertaining to class II and class III gaming, on the facts and primary issue to be resolved, *Cabazon* can be distinguished from the instant case. First, unlike the instant case, *Cabazon* involved a state (i.e., California) that did not have as clear an antigambling policy as New York. Second, *Cabazon* involved an Indian tribe's attempt to operate bingo parlors which, under IGRA, falls under class II gaming and within tribal jurisdiction with oversight regulation by the National Indian Gaming Commission. Moreover, the Senate Report which accompanied the bill that eventually became IGRA (i.e., IGRA's legislative history) links language from *Cabazon,* i.e., the regulatory/prohibitory distinction, to class II gaming while remaining silent as to class III gaming, the gambling activity at issue here. Given this and the fact that class II and class III gaming are regulated in very different ways, Congress contemplated different treatment for class II and class III gaming. Third, *Cabazon* involved an analysis of: (1) whether a statute and county ordinances addressing gambling were criminal (i.e., prohibitory) or civil (i.e., regulatory); and (2) whether California could enforce its gambling laws on Indian land. The instant case considers whether the Legislature has the authority to enact legislation that is in direct contravention to the New York State Constitution.

Thus, in view of the plain and unambiguous limitation on legislative authority set forth in article I, § 9 of the New York State Constitution, the State Legislature did not have the authority to enact part B of chapter 383 of the Laws of 2001. Further, neither IGRA nor any reading of *Mashantucket* and *Cabazon* could grant the Legislature such authority. Accordingly, part B of chapter 383 must be set aside as void and unconstitutional, including Executive Law § 12 (regarding Governor's authority to enter into tribal-state compacts) and the amendments to Penal Law § 225.30 (a) (1) and (b) (regard-

ing the legalization of slot machines for class III gaming purposes).

In affirming the lower court's holding regarding part B of chapter 383, and thereby disregarding the article I, § 9 limitation on the Legislature, the majority has essentially concluded that IGRA provides a means for the Legislature to circumvent this State's constitutional limitations and pass legislation that it normally could not. This conclusion suggests, at least with regard to gaming on Indian lands, that IGRA exerts control over how legislation is passed and even supplants this State's Constitution. In view of New York State's status as a sovereign state and the fact that New York State's Constitution is the supreme law of the State, this notion is incorrect.

Moreover, effectively extending power to IGRA, with regard to the State's Constitution, is improper because the people of New York State, not Congress or the Secretary of the Interior or the State Legislature, approve the State Constitution and any amendments thereto (see NY Const, art XIX, § 1). Thus, if the people are not permitted to consider and vote on a subject covered under the State Constitution, their constitutional rights have been violated.

For example, the people have approved certain exceptions to the State's general ban on gambling, as well as highly regulated, noncommercial games of chance authorized under article I, § 9 of the New York State Constitution and article 9-A of the General Municipal Law.[31] However, the high-stakes commercialized gaming and games contemplated under part B of chapter 383

---

**31.** General Municipal Law § 186 (3) provides:

" 'Games of chance' shall mean and include only the games known as 'merchandise wheels', 'coin boards', 'merchandise boards', 'seal cards', 'raffles', and 'bell jars' and such other specific games as may be authorized by the board, in which prizes are awarded on the basis of a designated winning number or numbers, color or colors, symbol or symbols determined by chance, but not including games commonly known as 'bingo or lotto' which are controlled under article fourteen-H of this chapter and also not including 'bookmaking', 'policy or numbers games' and 'lottery' as defined in section 225.00 of the penal law. No game of chance shall involve wagering of money by one player against another player."

The Board has authorized other "games of chance" including: (1) craps; (2) roulette; (3) blackjack; (4) big six; (5) big nine; (6) money wheel; (7) color wheel; (8) chuck-a-luck; (9) hazard; (10) under and over seven; (11) beat the dealer; (12) bang; (13) joker seven; (14) horse race wheel; (15) best poker hand; (16) fruit wheel; (17) card wheel; and (18) raffles (see 9 NYCRR 5620.3-5620.22).

were not approved by the people.[32] In other words, the Legislature, by purporting to make a policy decision within its power, i.e., enacting part B, delegated to the Governor the authority to execute tribal-state compacts, authority that, pursuant to the limitation on legislative power set forth in article I, § 9, the Legislature does not have. Accordingly, part B is not an improper delegation of legislative authority as plaintiffs contend. This implies that the Legislature had the authority to enact part B. Instead, because the Legislature does not have the authority to empower a state official to enter into an agreement for the establishment of commercialized gambling, the Legislature's "delegation" was an action without consequence.

Although under General Municipal Law § 186 (3), other games of chance may be authorized by the Board, the following games, included in the instant Tribal-State Compact, have not been authorized as "games of chance" under New York law: (1) baccarat; (2) carribean stud poker; (3) keno; (4) let it ride poker; (5) minibaccarat; (6) pai gow poker; (7) pai gow tiles; (8) red dog; (9) sic bo; (10) super pan; (11) casino war; (12) spanish blackjack; (13) multiple action blackjack; and (14) three card poker. These games are not permitted to be engaged in for any purpose by any person, organization or entity (see 25 USC § 2710 [d] [1] [B]). Accordingly, even if New York State could legally enter into a tribal-state compact, it could refuse to negotiate with the Seneca Nation of Indians regarding the tribe's operation of these unauthorized games (see e.g., Cheyenne Riv. Sioux Tribe v State of S.D., 3 F3d 273 [8th Cir 1993]). Note also that New York State can refuse to negotiate if the Seneca Nation of Indians wants to operate a game that is a variation of the authorized game (id.). Moreover, in light of the article I, § 9 limitation to the Legislature's power, the subject matter of part B of chapter 383 clearly falls within the ban on commercialized gaming.

This legislation, specifically the portions authorizing the execution of compacts, should first have been put through the

---

**32.** For example, blackjack, a regulated, "authorized game[ ] of chance" (see 9 NYCRR 5620.5), that was approved by the people of New York, is materially different from the game played at the Seneca Niagara Casino. One major difference is the maximum bet amount. The maximum bet for the "authorized" game is $5 or its equivalent in chips (id.). Meanwhile the maximum bet for the "same" game at the Seneca Niagara Casino is $2,500, 500 times the amount of the regulated, "authorized" game (see Brief for Park Place, at 24). It is clear that the people of New York State did not approve "this" game of blackjack.

amendment process so that the people of New York State could decide whether such compacts for the establishment of high-stakes games or gaming should become permissible under the State Constitution and whether the Legislature can enact legislation authorizing the execution of such compacts. Because the high-stakes commercialized gaming and games, and the pro-visions regarding the compacts were not put before the people through the amendment process, the rights of New York's citizens have been violated.

Affirming part B presents another problem regarding the ability of the people to exercise their collective voice. During oral argument, state respondent conceded that theoretically, there would be no legal impediment to having casinos placed in New York City and Albany as long as the requirements regard-ing after-acquired Indian lands held in trust for an Indian tribe (25 USC § 2719 [b] [1] [A]) are met. Specifically, if the Secretary of the Interior: (1) purchases land in, for example, New York City and Albany and holds it in trust for Indian tribes; and (2) determines that a gaming establishment(s) on the newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surround-ing community; and (3) the Governor concurs, there could be commercialized Indian gaming in New York City and Albany without the required approval, via the amendment process, of the people of the State of New York.

## Conclusion

Contrary to the majority's position, part B of chapter 383 is not a duly enacted statute because, given the article I, § 9 limita-tion on the Legislature's ability to enact legislation empowering the Governor to enter an agreement for the establishment of commercialized gambling, the Legislature did not have the authority to enact part B. Put another way, since New York's Legislature does not have the constitutional or statutory author-ity to enact legislation to establish commercialized gambling, it certainly cannot enact legislation empowering the Governor to execute compacts for the sole purpose of establishing casinos where commercialized gambling will take place.

The majority made a number of points pertaining to the control a state can exert on Indian lands and the validity of games under a gaming compact, i.e., it noted that, under IGRA, state laws prohibiting commercialized gambling do not apply on Indian lands, that a state enjoys more regulatory control over

Indian casino gaming than it would ordinarily, and further, that regarding such gaming, "state involvement and regulation is to be favored." (Majority op at 261.) However, these points do not consider the step that necessarily precedes the Governor's negotiation and entering of Indian gaming compacts, i.e., the legislative authorization held to be necessary under *Saratoga County*. Regarding this step, the majority states that under *Saratoga County*, negotiating and entering compacts involve policy decisions within the power of the Legislature (*see* majority op at 262; *Saratoga County*, 100 NY2d at 823). However, this decision did not consider that the Legislature is subject to a constitutional limitation that prohibits it from enacting the type of legislation at issue here. In other words, it is clear, given the constitutional and statutory limitations on the Legislature's power to enact laws in furtherance of commercial gambling, that passing laws in that area cannot be considered an example of a policy decision within the power of the Legislature. Since passing laws establishing commercialized gambling is not a policy decision within the power of the Legislature, the Legislature's enactment of part B of chapter 383 cannot stand.[33] Also, as New York State is sovereign in its own right, Congress, through IGRA, cannot dictate what areas the Legislature can legislate in or direct the Legislature to take action that it could not ordinarily take, especially when the legislation that results from such dictation or direction would be in direct contravention with a constitutional limitation on the Legislature's authority to act in a given area. Moreover, article I, § 9 was approved by the people of the State of New York as a general prohibition against gambling, with certain exceptions, and as a limitation on the Legislature's general right to legislate. IGRA cannot supplant that constitutional provision because that would necessarily mean the rights and interests that IGRA is most concerned with protecting, i.e., those of the Indian tribes, outweigh the will of the people of New York State.

Finally, in *Alden v Maine* (527 US 706, 748, 758 [1999]), a case which held that Congress could not require that a state be sued in a state court, the Supreme Court stated:

---

**33.** IGRA was meant to preempt the field regarding the governance of gaming activities on Indian lands. Further, a main thrust of IGRA is that if a state allows a certain type of gaming conduct for any purpose, a state must allow Indian tribes to engage in such gaming conduct on Indian lands for any purpose. These key concepts speak to whether a state law prohibition against a certain kind of conduct can apply on Indian lands, not whether the Legislature may pass laws in a given area.

"Although the Constitution grants broad powers to Congress, our federalism requires that Congress treat the States in a manner consistent with their status as residuary sovereigns and joint participants in the governance of the Nation. . . .

"Congress has vast power but not all power. When Congress legislates in matters affecting the States, it may not treat these sovereign entities as mere prefectures or corporations. Congress must accord States the esteem due to them as joint participants in a federal system, one beginning with the premise of sovereignty in both the central Government and the separate States. Congress has ample means to ensure compliance with valid federal laws, but it must respect the sovereignty of the States."

According to the *Alden* decision, Congress could not negate a New York State constitutional policy that goes back over three centuries. Moreover, Congress, through IGRA, did not negate or intend to negate that policy. Rather than submit to such an interpretation, until the Supreme Court rules otherwise, this Court should adhere to the clear mandate of the New York State Constitution.

Based on the foregoing, part B of chapter 383 should be held as void, illegal and unconstitutional, any compact(s), entered into pursuant to part B of chapter 383, should be held as void and unenforceable, any casinos opened and operating pursuant to such a compact should be declared unable to continue operations and the Governor and other New York State officials should be declared unable to engage in activities in furtherance of part B of chapter 383. Further, I would reverse the lower court decision granting summary judgment on that portion of appellants' complaints pertaining to part B of chapter 383 and reinstate those causes of action.

In this case, the Governor and the Attorney General, as is their right, have seen their duty as requiring them to forgo the New York State Constitution and apply a federal statute. Normally they would be advocates for the State Constitution. The result is to leave the people of the State of New York without a state advocate for a provision in its Bill of Rights. Perhaps, this Court or the Attorney General should have appointed one. In any case, while it is clear that the federal government has preempted the field in how gaming is to be conducted on Indian lands, it does not follow that preemption forces New

York to have its Governor and Legislature approve commercial gambling in spite of the New York State Constitution. Nothing in IGRA requires New York to set up commercial gambling on Indian lands or on lands acquired by Indians.

Because I do not agree with the majority's holding regarding part B of chapter 383 of the Laws of 2001, I dissent.

R.S. Smith, J. (dissenting). I dissent from the majority's holding that part C of chapter 383 of the Laws of 2001 is constitutional, and would affirm the Appellate Division's holding that it is not. The requirement of article I, § 9 (1) of the New York Constitution that the net proceeds of a lottery "shall be applied exclusively to or in aid or support of education" can be too easily evaded if the Legislature may require vendors to spend a portion of the funds they receive from the lottery for noneducational purposes of the Legislature's choosing.

The statute as originally enacted provided for a "vendor's fee" to racetracks of between 12% and 25% of the revenue remaining after payment of prizes, and required the vendors to "reinvest" between 35% and 45% of that fee in enhanced purses and a breeding fund. In other words, the Legislature required that between 4.2% and 11.25% of after-prize revenue be devoted to increasing racetrack prizes and breeding horses—not to the "aid or support of education." The Legislature could not have appropriated lottery funds for racetrack purses or horse breeding, and should not be allowed to accomplish the same end by directing vendors to "reinvest."

To me, the issue is that simple. It is not relevant that, as the majority notes, other statutes direct racetracks to divert some of their income to purses and breeding funds (majority op at 267-268); the income to which those statutes apply is not lottery income and is not subject to the "exclusively to . . . education" restriction of article I, § 9. Nor is it relevant that the maximum vendor's fee under part C was increased from 25% to 29% of revenue remaining after prizes (majority op at 269); the reinvestment was included in both fee levels, so the increase proves nothing about whether the reinvestment had the effect of inflating the fee.

The essence of the majority's position is that plaintiffs have not proved that the reinvestment is a device to thwart the constitutional limitation. The majority suggests that the vendor's fee called for by the statute is not inflated by the required reinvestments—that the fee may be the lowest a

vendor would take in any event, and that the reinvestments may be expenditures the racetracks would make anyway. The majority also says that "[t]he Legislature was entitled to determine" that the reinvestment expenditures are a reasonable way to enhance racetrack attendance, and that increased attendance will in turn increase lottery revenues (majority op at 268).

I agree that plaintiffs have not proved that the reinvestment provisions of part C were designed to evade the constitutional requirement; it is very hard to prove such evasion, or to disprove it. I also agree with the majority that "[i]t is generally not for the courts to determine whether a particular vendor's fee . . . is reasonable" (majority op at 269); indeed, it will usually be impossible for courts to do so. That is precisely why a "reinvestment" requirement offers a temptation to a Legislature that wants to escape the constitutional restriction. Indeed, in saying that it "can perhaps imagine" a case where a "flagrant end run" around the constitutional requirement would be invalidated (majority op at 269), the majority seems to sanction in advance any end run that falls short of being flagrant. I find this too lax an approach to the enforcement of article I, § 9, and I think we should hold simply that no legislatively-directed diversions of funds from lottery vendor's fees to noneducational purposes are allowed.

Chief Judge KAYE and Judges ROSENBLATT, GRAFFEO and READ concur with Judge CIPARICK; Judge G.B. SMITH dissents in part and votes to modify by declaring part B of chapter 383 of the Laws of 2001 unconstitutional in a separate opinion; Judge R.S. SMITH dissents in part and votes to affirm in another opinion in which Judge G.B. SMITH concurs in so much thereof as pertains to part C of chapter 383 of the Laws of 2001.

Order modified, etc.